# IN THE SUPREME COURT OF IOWA

No. 18–2222

Filed January 31, 2020

**STATE OF IOWA,**

Appellee,

vs.

**JEFFREY ALAN MEYERS,**

Appellant.

---

Appeal from the Iowa District Court for Guthrie County, Paul R. Huscher (suppression hearing), and Michael K. Jacobsen (trial), Judges.

A defendant appeals his conviction for boating while intoxicated, challenging the denial of his motion to suppress. **AFFIRMED.**

Robert G. Rehkemper of Gourley, Rehkemper & Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Thomas J. Ogden, Assistant Attorney General, Brenna Bird, County Attorney, and Timothy D. Benton, Assistant County Attorney, for appellee.

**MANSFIELD, Justice.**

This "blue light special" presents an important question about the status of Lake Panorama and several other recreational lakes in the State of Iowa that were created by damming our rivers.

On a midsummer evening, two officers of the Iowa Department of Natural Resources (DNR) were patrolling Lake Panorama. They observed a pontoon boat displaying blue lights. They stopped the boat for violating Iowa Code section 462A.12(4) (2018). That statute provides, "No person shall operate on the waters of this state under the jurisdiction of the conservation commission any vessel displaying or reflecting a blue light or flashing blue light unless such vessel is an authorized emergency vessel." *Id.*

The stop revealed that the operator of the boat appeared to be intoxicated. He was arrested and ultimately convicted of boating while intoxicated in violation of Iowa Code section 462A.14(1). Before trial, he filed a motion to suppress, asserting that Lake Panorama was not "waters of this state under the jurisdiction of the conservation commission." *See id.* § 462A.12(4). Therefore, he argued, section 462A.12(4) did not apply and there was no probable cause for the stop. The district court denied the motion to suppress, but it forms the basis for the current appeal.

On appeal, we hold that the officers had probable cause to stop the operator's vessel because the DNR has jurisdiction over Lake Panorama and it is not a "privately owned lake" as defined in section 462A.2(31). *See id.* § 462A.2(31). When Lake Panorama was created in 1970 by damming the Middle Raccoon River, it remained accessible to the public by boat coming down the river from the northwest. Although the property owners association has attempted to block off that access, this does not change

the character of the body of water as belonging to the people of Iowa. Accordingly, we affirm the operator's conviction.

## I. Background Facts and Proceedings.

On the evening of July 7, 2018, two conservation officers employed by the DNR were participating in a "saturation patrol" on Lake Panorama. The patrol involved several officers in boats enforcing the navigation laws on the lake. The boats had been launched from a slip rented to the DNR by the Lake Panorama Association (LPA), an association of private property owners who own the land around the lake.

At around 10:45 p.m., the officers observed a pontoon boat displaying blue lights. The boat was being operated by the defendant, Jeffrey Meyers, and had eight passengers, including four young children. The officers stopped the boat for violating Iowa Code section 462A.12(4), which prohibits the display of a blue light by a vessel operating in "the waters of this state under the jurisdiction of the conservation commission." The officers proceeded to do a routine safety inspection of the vessel, looking for required equipment. One of the officers, who had closer contact with Meyers, noticed he had "some slurred speech, bloodshot watery eyes, [and] smelled of alcohol." There was an open beer container at his position on the boat. When Meyers was asked to retrieve the fire extinguisher, he fumbled the latch. Meyers failed field sobriety tests and a preliminary breath test. He was arrested. At the Guthrie County Sheriff's Office, a chemical test revealed that Meyers had a blood alcohol content of .173.

Meyers was charged with one count of boating while intoxicated in violation of Iowa Code section 462A.14(1) and four counts of child endangerment in violation of Iowa Code section 726.6(1)(*a*). He moved to suppress the results of the July 7 stop, urging that it violated both the Fourth Amendment of the United States Constitution and article I,

section 8 of the Iowa Constitution. Specifically, Meyers maintained the stop was unlawful because the prohibition on operating a vessel with a blue light applied only to "waters of this state under the jurisdiction of the conservation commission," a term that excludes "privately owned lakes." *See* Iowa Code § 462A.2(22) (defining "navigable waters"); *id.* § 462A.2(31) (defining "privately owned lake"); *id.* § 462A.2(45) (defining "waters of this state under the jurisdiction of the commission"); *id.* § 462A.12(4) (prohibiting the use of blue lights on waters of this state for nonemergency vessels). Meyers asserted that Lake Panorama is a privately owned lake. *See id.* § 462A.2(31).

Lake Panorama is now about fifty years old. In 1970, with the permission of the state, the Middle Raccoon River was dammed near Panora by a group of private property owners, creating Lake Panorama. At present, all of the property surrounding the lake is privately owned and every owner of lakefront property is a member of the LPA. The LPA owns the dam. The LPA also owns the bed under the lake, as well as the lake's only marina and boat ramp. Use of the boat ramp is limited to LPA members.[1] The LPA has put up signs stating that Lake Panorama is a "private lake." The LPA also conducts its own patrols of the lake and has its own boating regulations, which it enforces.

However, the Middle Raccoon River still flows *into* the lake, and the public can access the river at Springbrook State Park above the lake. At the suppression hearing, a DNR officer testified that when he was on duty in 2006 and 2007, he would put into the river at the state park so he could enter Lake Panorama in his boat for enforcement purposes unannounced.

---

[1]However, as noted, the LPA rents a slip at the marina to the DNR.

Also, a river still flows *out of* the lake. There is an outlet at the dam that allows water to keep flowing, as the Middle Raccoon River continues south and east until it joins the South Raccoon River in Dallas County.

At the suppression hearing, evidence was presented that the LPA has put up a barrier at the northwest end of the lake near where the Middle Raccoon River flows into the lake in order to catch debris. When the barrier was installed, the DNR directed the LPA to move it so it would not interfere with navigation between the river and the lake.[2]

Following a hearing, the district court denied the motion. The court concluded that the DNR has jurisdiction over Lake Panorama because it constitutes navigable waters and is not a privately owned lake within the meaning of Iowa Code section 462A.2. *See id.* § 462A.2(22), (31), (45). The court said in part,

> As to the river feeding into the lake, Springbrook State Park, north of Lake Panorama, maintains a public boat ramp into the Middle Raccoon River. The evidence in this case supports the conclusion, and the court does conclude, that the Middle Raccoon River, at least from Springbrook State Park to Lake Panorama, constitutes "navigable waters". In fact, the Southwest Iowa District Supervisor of the DNR testified regarding the access by boat from Springbrook to the lake, and that the only time it was inaccessible was when the water was high enough that a boat could not get under the bridge at Fansler (County Road P18/180th Trail). The conclusion that the Middle Raccoon River is a navigable stream inlet to Lake Panorama finds further support in the definition of "artificial lake" at 571 Iowa Admin. Code ch. 16.1:
>
> > "*Artificial lake*" means all river impoundments and all other impoundments of water to which the public has a right of access from land or from a navigable stream inlet. **Examples are Lake Panorama,** Lake Delhi, Lake Nashua, and Lake Macbride. [emphasis added]

---

[2]Meyers testified at the suppression hearing that the barrier now extends across the lake so as to make it impossible for a boat like his pontoon boat to get between the river and the lake.

The court then discussed the legal significance of the LPA's actions:

> The Defendant provided evidence that the Lake Panorama Association claims the lake is the "largest private lake" in the state, that it has posted signs claiming its private nature, and that the LPA has attempted to barricade the north end of the lake where the Middle Raccoon River enters.
>
> The court does not find any authority for the proposition that posting of signs or the advertisements of littoral landowners has any significance in determining the rights granted or denied by statute. If the waters are indeed navigable, the barricading of such waters constitutes nothing more than a nuisance. *See* [Iowa Code] § 657.2 . . . ("The following are nuisances: . . . 3. The obstructing or impeding without legal authority the passage of any navigable river, harbor, or collection of water.")

Thereafter, Meyers stipulated to a trial on the minutes of testimony. The court found Meyers guilty of boating while intoxicated, imposed sentence, and dismissed the child endangerment counts.

Meyers filed his notice of appeal, and we retained the appeal.

## II. Standard of Review.

Our review of constitutional claims is de novo. *State v. Pettijohn*, 899 N.W.2d 1, 12 (Iowa 2017). However, our review is for correction of errors at law to the extent the constitutional claims raise issues of statutory interpretation. *Id.*; *see State v. Harrison*, 846 N.W.2d 362, 365 (Iowa 2014).

## III. Analysis.

As noted, the blue-light prohibition applies to "the waters of this state under the jurisdiction of the conservation commission." Iowa Code § 462A.12(4). Is Lake Panorama such a water? That is the salient issue on appeal.

To put it another way, this case presents the question whether the waters of Lake Panorama belong to all the people of Iowa or only to the

group of private property owners who own the land surrounding and underneath the lake itself.

**A. Law in Other Jurisdictions.** The general rule is that even when the bed under a navigable body of water is privately owned, the body of water belongs to the public if the public can lawfully access that body of water. For example, in *State v. Head*, a private property owner had dammed Black Creek, thereby creating a lake (Black's Pond) entirely on private property. 498 S.E.2d 389, 391 (S.C. Ct. App. 1997) (per curiam). "No trespassing" signs were posted. *Id.* Nonetheless, Head launched his boat on the creek upstream with permission and made into the lake where he was charged with trespassing. *Id.* The South Carolina Court of Appeals upheld the reversal of Head's conviction, reasoning,

> It appears, however, that in the case of nontidal navigable streams, while the adjacent property owners hold title from their shoreline to the center of the stream bed, the public has an easement in use of the waterway. Thus, if a nontidal watercourse is navigable, then a person who legally accesses the watercourse, and fishes from within a boat on the watercourse, cannot be convicted of violating § 50–1–90, as such a person has a constitutional and statutory right to be there.

*Id.* at 392–93 (citations omitted). The court went on,

> [R]elevant authorities have considered a waterway navigable in the appropriate case if a small sport fishing boat could negotiate it at its ordinary stage. However, the existence of occasional natural obstructions to navigation, such as rapids or falls, or the construction of authorized or unauthorized artificial obstructions to navigation, such as dams, generally does not change the character of an otherwise navigable stream. Artificial lakes along navigable streams are generally open to public use as well, even if they were created by an authorized private entity and cover part of privately owned land.

*Id.* at 394–95 (citations omitted).

Likewise, in *Bott v. Commission of Natural Resources*, the Michigan Supreme Court reasoned,

> [P]rivate lakes cannot be construed to include those having *either* a navigable inlet *or* a navigable outlet where all the land surrounding the lake is owned by a private person. To do so would ignore the fact that the public has lawful access to the water and would be inconsistent with well-reasoned prior cases on the subject. . . .
>
> . . . .
>
> . . . [I]t matters not that one may be owner in fee of all the land underlying and surrounding a qualifiedly navigable lake. . . .
>
> . . . .
>
> One may not trespass on private lands to reach a lake to exercise usage rights. However, if access to a lake may be obtained by use of a navigable inlet, outlet, or both, those members of the public having lawful access to the waterway may also freely boat and fish upon the lake. Whether the inlet or outlet is navigable will depend upon whether the waters are capable of being navigated by small craft propelled by oar, paddle or motor.
>
> Accordingly, we hold that lakes which are private for purposes of determining whether public use of the lake surface is permissible are limited to those lakes having no navigable inlet or navigable outlet, completely surrounded by land owned by a private person to which the public has no other ordinary lawful means of access. Since the presence of navigable inlets or outlets provides the public with a lawful means of access to a lake which is navigable in fact, such a lake cannot be determined to be wholly private. The public's right to use inland waters impressed with the trust to which the public has lawful access may not be abrogated.

327 N.W.2d 838, 871–72 (Mich. 1982); *see also Mont. Coal. for Stream Access, Inc. v. Curran*, 682 P.2d 163, 171 (Mont. 1984) (holding that a private party may not interfere with traffic along a stream because "any surface waters that are capable of recreational use may be so used by the public without regard to streambed ownership or navigability for nonrecreational purposes"); *Ohio Water Serv. Co. v. Ressler*, 180 N.E.2d 2,

7 (Ohio 1962) ("[T]he exclusive right to fish even as against the public is vested in the owner of the land underlying waters which are not legally navigable, except where such waters are a portion of a body of water that is legally navigable."); *Hix v. Robertson*, 211 S.W.3d 423, 427–28 (Tex. App. 2006) (holding the public has a right to use a lake formed by the damming of a statutory navigable stream).

**B.  Iowa's Statutory Provisions.**  Iowa Code chapter 462A appears to mirror this general law.  Section 462A.2(45) provides,

> "*Waters of this state under the jurisdiction of the commission*" means any navigable waters within the territorial limits of this state, and the marginal river areas adjacent to this state, exempting only farm ponds and privately owned lakes.

Iowa Code § 462A.2(45).[3]    Additionally, section 462A.2(22) defines "navigable waters" broadly as "all lakes, rivers, and streams, which can support a vessel capable of carrying one or more persons during a total of six months in one out of every ten years."  *Id.* § 462A.2(22).  Meanwhile, chapter 462A defines a "privately owned lake" as a lake "which is not open to the use of the general public but is used exclusively by the owners and their personal guests."  *Id.* § 462A.2(31).

Chapter 462A also declares that all flowing rivers and streams are "public waters of the state of Iowa and subject to use by the public for navigation purposes in accordance with law."  *Id.* § 462A.3A.  This rule applies regardless of who owns the land underneath: "Land underlying flowing surface water is held subject to a trust for the public use of the water flowing over it."  *Id.*[4]  Thus, a flowing river or stream that can support a vessel is both "navigable" and "subject to use by the public."

---

[3]"Commission" refers to the natural resource commission, which is part of the DNR.  *See* Iowa Code § 462A.2(7).

[4]This rule also applies whether or not the river or stream is "meandered."  *See* Iowa Code § 462A.3A.  Iowa Code section 462A.3A, in fact, assumes that the river or

**C. Resolving the Status of Lake Panorama.** As the foregoing authority indicates, flowing surface water in Iowa is legally open and available for public use regardless of who owns the land below it. The water in the Middle Raccoon River therefore belonged to the public before 1970 when the river was dammed to form Lake Panorama. It is also clear that the Middle Raccoon River above and below Lake Panorama remains a water of the state today. The question is whether the 1970 dam somehow changed things for the stretch of the river that was widened to form Lake Panorama.

We think not. When the dam was erected, it remained possible for a vessel to travel down the Middle Raccoon River into Lake Panorama. And if the river is indisputably open to the public and a boat can legally get from there to the lake, then the lake is "open to the use of the general public" and cannot be "used exclusively by the owners and their personal guests." *See id.* § 462A.2(31).

Meyers relies heavily on the actions of the LPA in putting up a barrier near the entry point of the Middle Raccoon River into Lake Panorama and in repeatedly declaring the lake to be private property. But we agree with the district court: If the public has a right to be there, so long as the public enters via the Middle Raccoon River and Springbrook State Park, using private self-help in violation of Iowa Code section 657.2 to keep the public out does not change the status of the lake. *Id.* § 657.2; *see State v. Sorensen*, 436 N.W.2d 358, 362 (Iowa 1989) (holding that the state cannot lose title to public trust property by adverse possession); *Witke v. State Conservation Comm'n*, 244 Iowa 261, 271, 56 N.W.2d 582, 588 (1953)

---

stream is not "meandered"; even so, the public use principle applies. *See id.* (stating that use of flowing surface water "is subject to the same rights, duties, limitations, and regulations as presently apply to meandered streams").

("[A]ll persons have a right to use the navigable waters of the state, so long as they do not interfere with their use by other citizens . . . ."); *see also Bott*, 327 N.W.2d at 872 ("The public's right to use inland waters impressed with the trust to which the public has lawful access may not be abrogated."); Op. Iowa Att'y Gen. No. 96-2-3 (Feb. 6, 1996), 1996 WL 169627, at *6 ("[W]hether or not section 657.2(3) is applicable to a fence across a non-meandered stream, such a fence could constitute a common law nuisance by interfering with public navigation.").

Like the district court, we recognize that a 1970 attorney general opinion concluded Lake Panorama would be a privately owned lake not under state jurisdiction. 1970 Op. Iowa Att'y Gen. 503, 508 (1970). In that opinion, the attorney general quoted the statute accurately: "[I]n order to be exempt from state water navigation regulations imposed pursuant to Chapter 106 [now chapter 462A], the lake must also be ' . . . not open to the use of the general public but . . . used exclusively by the owners and their personal guests.'" *Id.* at 506 (quoting Iowa Code § 106.2(12) (now § 462A.2(31) (2018)). The attorney general then elaborated,

> We are, therefore, of the opinion that the water of the proposed Lake Panorama, under the facts noted, are exempt from state water navigations as a "privately owned lake" if substantially all use thereof is limited to owners of the lake and their personal guests, the latter term implying a host-visitor relationship between the owners and particular visitors.

*Id.* at 508.

We share the district court's view that this attorney general opinion misreads the statute. The statutory test is whether the lake is *open* to public use or not. The test is not whether substantially all the actual users happen to be owners of shoreline property. The district court put it well: "A claim of 'substantially all use' is not equivalent to, and does not support

a finding of, 'not open to the use of the general public' and use 'exclusively' by the owners and their guests." We give attorney general opinions respectful consideration but are not bound by them. *See Rilea v. Iowa Dep't of Transp.*, 919 N.W.2d 380, 391–92 (Iowa 2018); *see also Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 17 (Iowa 2010) (declining to follow an attorney general opinion). We respectfully disagree with this one.

More significant to us is the fact that the DNR's own administrative regulations recognize Lake Panorama as a lake to which the public has access and over which the DNR has jurisdiction. In rule 571—16.1, "artificial lake" is defined to mean "all river impoundments and all other impoundments of water to which the public has a right of access from land or from a navigable stream inlet. Examples are Lake Panorama, Lake Delhi, Lake Nashua, and Lake Macbride." Iowa Admin. Code r. 571—16.1; *see also* Iowa Code § 4.6(6) ("If a statute is ambiguous, the court, in determining the intent of the legislature, may consider among other matters . . . [t]he administrative construction of the statute."). We recognize that rule 571—16.1 may be intended to implement provisions other than the ban on blue lights, but the DNR has been interpreting the same operative language within chapter 462A—"waters of this state under the jurisdiction of" the natural resources commission. *Compare* Iowa Code § 462A.4 (unnumbered vessels); *id.* §462A.27 (nonpermanent structures); *and id.* § 462A.32(1)–(2) (buoys), *with id.* § 462A.12(4) (blue lights).

We also agree with the district court that another attorney general opinion is better reasoned and more persuasive. *See* 1962 Op. Iowa Att'y Gen. 55, 55 (1962). There the attorney general concluded that privately dug lagoons on private land that were navigable by boat from West Okoboji Lake were themselves navigable waters under the jurisdiction of the DNR's predecessor. *Id.* Quoting the statutory definitions now in chapter 462A,

the attorney general noted that "the water flows freely from the natural lake into and out of the lagoons and canals." *Id.* He concluded, "As these lagoons are defined in your letter, they are under the foregoing rules of law a portion of Lake Okoboji, even though they originally may have been privately constructed." *Id.* at 56. Here, too, water flows freely from the Middle Raccoon River into Lake Panorama, making the latter body part of the navigable waters.

We do not believe *Orr v. Mortvedt* has any bearing on our decision. 735 N.W.2d 610 (Iowa 2007). Neither side cited *Orr* in their briefing. *Orr* involved an excavated rock quarry that over time filled with water and became a lake; it was surrounded on all sides by privately owned land. *Id.* at 611–12. Hence, *Orr* involved a landlocked lake. *See id.* Thus, all the analysis in *Orr* proceeds from the starting point that the lake was nonnavigable. *See id.* Here, by contrast, the lake was created by damming a navigable river. The river continues to be accessible to the public and flows into the lake. *Orr* specifically states, "[I]f the lake at issue in this case is navigable, the plaintiffs have no right to exclude [the defendants] from using and enjoying any part of it." *Id.* at 615. *Orr* deals with some of the legal consequences of nonnavigability; it does not provide any legal guidance regarding the status of Lake Panorama under Iowa Code chapter 462A.

Arguably, the LPA wants it both ways. It wants the benefits of DNR boating law enforcement, while also keeping the lake private to its members. We do not think Iowa's laws permit that. If Meyers is correct, many other boating laws would not be enforceable on the lake. *See, e.g.,* Iowa Code § 462A.4 (indicating that numbering is required if the vessel is being operated "on the waters of this state under the jurisdiction of the commission"); *id.* § 462A.12(15) (requiring lifejackets for children if the

vessel is being operated "on the waters of this state under the jurisdiction of the commission"); *id.* § 462A.15(1) (requiring an observer for water skiers under the tow of the vessel being operated "on any waters of this state under the jurisdiction of the commission"); *id.* § 462A.26(3)(*a*) (indicating that speed and distance regulations apply to "waters under the jurisdiction of the commission").

For all these reasons, we find that Lake Panorama is not a "privately owned lake" but falls under the DNR's jurisdiction.[5]

**D. The Glitch in Iowa Code Section 462A.12(4).** As an alternative ground for relief, Meyers notes that the prohibition on operating a vessel with a blue light technically applies only to "waters of this state under the jurisdiction of the conservation commission." *See id.* § 462A.12(4). The conservation commission no longer exists, having been replaced by the natural resources commission within DNR in 1986. *See* 1986 Iowa Acts ch. 1245, § 1808. Thus, Meyers contends the prohibition is a nullity.

In the 1986 legislation, it appears an inadvertent error was made. The word "commission" was not substituted for the words "conservation commission" in this section, as occurred with other sections. *See id.* § 1826. We conclude that this clerical error does not undo the statute and render it meaningless. *See State v. Dann*, 591 N.W.2d 635, 639 (Iowa 1999) ("[W]e have recognized in limited circumstances the power to judicially construe legislative enactments in such a way as to correct inadvertent clerical errors or omissions that frustrate obvious legislative

---

[5]Of course, we do not suggest that the LPA or any individual property owner has any obligation to permit public access to Lake Panorama over their land. *See Larman v. State*, 552 N.W.2d 158, 161 (Iowa 1996) (stating that "the public's right of access to public waters is part of the public trust" but "access is protected only to the extent the land providing such access is owned by the State").

intent."); *Schultze v. Landmark Hotel Corp.*, 463 N.W.2d 47, 49 (Iowa 1990) ("[W]e have made changes in legislative enactments to correct inadvertent clerical errors or omissions which frustrate obvious legislative intent."); *Jones v. Iowa State Highway Comm'n*, 207 N.W.2d 1, 4 (Iowa 1973) ("If we were to recognize the literal language of the statute, we would be hard put to ascribe [a]ny sensible meaning to the words . . . ."). Therefore, we reject this argument.

## IV. Conclusion.

For the foregoing reasons, we affirm the district's court denial of the motion to suppress and affirm Meyers's conviction and sentence.

**AFFIRMED.**

All justices concur except Wiggins, C.J., and Appel, J., who dissent.

**WIGGINS, Justice (dissenting).**

I dissent.  I part ways with the majority because I conclude Lake Panorama is a privately owned lake as defined in Iowa Code section 462A.2(31) (2018).  Section 462A.12(4)'s prohibition of displaying a blue light does not apply because Lake Panorama is a privately owned lake.  Thus, the stop of the boat by the two officers of the Iowa Department of Natural Resources was illegal.  I reach these conclusions for the following reasons.

## I.  The Constitutional and Statutory Provisions.

Article I, section 8 of the Iowa Constitution guarantees

> [t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8.  Its federal counterpart similarly provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"Warrantless searches and seizures are per se unreasonable unless one of several carefully drawn exceptions to the warrant requirement applies."  *State v. Pettijohn*, 899 N.W.2d 1, 14 (Iowa 2017).  One such exception exists when the officer has probable cause for the stop because the officer observed a statutory violation.  *See State v. Harrison*, 846 N.W.2d 362, 365 (Iowa 2014) ("When a peace officer observes a traffic offense, however minor, the officer has probable cause to stop the driver

of the vehicle." (quoting *State v. Mitchell*, 498 N.W.2d 691, 693 (Iowa 1993))). Another exception is when the officer has "a reasonable, articulable suspicion that a criminal act has occurred, is occurring, or is about to occur," *Pettijohn*, 899 N.W.2d at 15 (quoting *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010)), and initiates an investigatory stop "to confirm or dispel suspicions of criminal activity through reasonable questioning," *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002).

The district court found the conservation officers had probable cause to stop Meyers's vessel because they observed a violation of Iowa Code section 462A.12(4). It also concluded that the officers had reasonable suspicion to stop Meyers's vessel for investigatory purposes upon observing the blue lights on the vessel.

**II. Whether the Conservation Officers Had Probable Cause to Stop Meyers's Vessel.**

When an officer observes a statutory violation, the officer has probable cause to stop the vessel. *See Harrison*, 846 N.W.2d at 365. Meyers contends the commission officers could not have observed a statutory violation of Iowa Code section 462A.12(4) because that provision does not apply to Lake Panorama.

Section 462A.12(4) provides, "No person shall operate on the waters of this state under the jurisdiction of the conservation commission any vessel displaying or reflecting a blue light or flashing blue light unless such vessel is an authorized emergency vessel." Iowa Code § 462A.12(4).

Meyers contends that section 462A.12(4) does not apply in this case because Lake Panorama is not under the jurisdiction of the commission. For Lake Panorama to be under the jurisdiction of the commission, it must be a "navigable water[] within the territorial limits of this state" and must not be a farm pond or privately owned lake. *Id.* § 462A.2(45) (defining

"waters of this state under the jurisdiction of the commission"). There is no dispute that the lake constitutes a navigable water as defined in section 462A.2(22) or that it is within the territorial limits of Iowa. *See id.* § 462A.2(22) (defining "navigable waters" as used in chapter 462A). The parties dispute only whether Lake Panorama is a privately owned lake.

Chapter 462A defines "privately owned lake" as

any lake, located within the boundaries of this state and not subject to federal control covering navigation owned by an individual, group of individuals, or a nonprofit corporation and which is not open to the use of the general public but is used exclusively by the owners and their personal guests.

*Id.* § 462A.2(31). Here, the parties disagree on only whether Lake Panorama "is not open to the use of the general public but is used exclusively by the owners and their personal guests." *Id.* Accordingly, I must consider the meaning of that language from section 462A.2(31).

"When interpreting a statute, we seek to ascertain the legislature's intent." *State v. Lopez,* 907 N.W.2d 112, 116 (Iowa 2018) (quoting *Dakota, Minn. & E. R.R. v. Iowa Dist. Ct.,* 898 N.W.2d 127, 136 (Iowa 2017), *overruled on other grounds by TSB Holdings, L.L.C. v. Bd. of Adjustment,* 913 N.W.2d 1, 14 (Iowa 2018)). We look to the language used by the legislature, not what it should or might have said. *Ramirez-Trujillo v. Quality Egg, L.L.C.,* 878 N.W.2d 759, 770 (Iowa 2016). We cannot allow legislative intent to change the meaning of a statute if the words used by the legislature do not allow for such a meaning. *See Schadendorf v. Snap-On Tools Corp.,* 757 N.W.2d 330, 337 (Iowa 2008).

If the legislature " 'act[s] as its own lexicographer' by defining a statutory term," that definition ordinarily binds us. *Pettijohn,* 899 N.W.2d at 15 (quoting *Sherwin-Williams Co. v. Iowa Dep't of Revenue,* 789 N.W.2d 417, 425 (Iowa 2010)). We construe other technical words and phrases

that "have acquired a peculiar and appropriate meaning in law . . . according to such meaning." Iowa Code § 4.1(38). We give all other terms their ordinary and common meaning "according to the context and the approved usage of the language." *Id.*; *accord Pettijohn*, 899 N.W.2d at 16; *Second Injury Fund of Iowa v. Kratzer*, 778 N.W.2d 42, 46 (Iowa 2010). Rather than assessing just isolated words and phrases, we consider the statute in its entirety "to ensure our interpretation is harmonious with the statute as a whole." *Ramirez-Trujillo*, 878 N.W.2d at 770.

Then we determine whether the statute is ambiguous. *Lopez*, 907 N.W.2d at 116. Ambiguity occurs when reasonable minds could disagree on the statute's meaning, *City of Waterloo v. Bainbridge*, 749 N.W.2d 245, 248 (Iowa 2008), and may arise from uncertainty of particular words' meanings or from examining all of the statute's provisions in context with each other, *Ramirez-Trujillo*, 878 N.W.2d at 770.

When the statute's language is "plain, clear, and susceptible to only one meaning," we do not search for meaning beyond the particular terms. *Bainbridge*, 749 N.W.2d at 248. But when the meaning is ambiguous, we resort to our tools of statutory construction. *Lopez*, 907 N.W.2d at 117; *see* Iowa Code § 4.6.

Although the Code does not define "not open to the use of the general public but . . . used exclusively by the owners and their personal guests," Iowa Code § 462A.2(31), section 462A.2 provides that "use" "means to operate, navigate, or employ a vessel," *id.* § 462A.2(39). Thus, a privately owned lake is one that is not open for the general public's operation, navigation, or employment of a vessel thereon but one where the exclusive operation, navigation, or employment of a vessel thereon is by its owners and their personal guests.

Assuming section 462A.2(39)'s definition of "use" applies to the "used exclusively" language, we give "exclusively" its ordinary and common meaning according to its context and approved usage. *See* Iowa Code § 4.1(38); *Pettijohn*, 899 N.W.2d at 16. By its ordinary meaning, exclusively means "in an exclusive manner." *Exclusively, Webster's Third New International Dictionary* (unabr. ed. 2002). And in this context, exclusive can mean "excluding or having power to exclude (as by preventing entrance or debarring from possession, participation, or use)"; "limiting or limited to possession, control, or use (as by a single individual or organization or by a special group or class)"; and "excluding . . . others (as outsiders) from participation (as in an association or privilege)." *Exclusive, Webster's Third New International Dictionary*; *accord Exclusive, Black's Law Dictionary* (11th ed. 2019) (defining "exclusive" in pertinent part as "[l]imited to a particular person, group, entity, or thing <exclusive right>"); *see also Exclusive right, Black's Law Dictionary* ("A right vested in one person, entity, or body to do something or be protected from something.").

I also give "open" its common and ordinary meaning according to its context and approved usage. *See* Iowa Code § 4.1(38); *Pettijohn*, 899 N.W.2d at 16. *Webster's* defines "open" in relevant part as "requiring no special status, identification, or permit for entry or participation"; "not restricted to a particular group or category of participants <~ to the public>"; "fit to be traveled over or through **:** presenting no serious obstacle to passage or view"; and "available to use." *Open, Webster's Third New International Dictionary*.

Under Meyers's interpretation, a lake is not open to the general public's use and is used exclusively by its owners and their guests when the intended use of the lake is not for the general public and access to the

lake is legally and actively restricted to only registered owners and their guests regardless of the general public's theoretical or occasional, unauthorized access to the lake from connecting navigable waters. Under the State's proffered interpretation, a lake is open to the general public's use when the public is logistically able to access it from a connecting navigable water and the lake's owners are prohibited from blocking the public's access from the connecting navigable water. Additionally, the district court concluded a lake is not used exclusively by its owners and their guests if the lake's owners lack the right to exclude others because the lake "is an impoundment of water to which the public has a right of access from a navigable stream inlet." Because all three interpretations are plausible, the statute is ambiguous, and I resort to our tools of statutory interpretation. *See Lopez*, 907 N.W.2d at 117–18.

Common law jurisprudence on property rights in water is instructive for resolving this ambiguity. *See* Iowa Code § 4.6(4) (permitting court to consider the common law when interpreting an ambiguous statute). Under Iowa common law, whether a lake or other watercourse is privately owned depends on who owns the lakebed and abutting lands. *See, e.g., Orr v. Mortvedt*, 735 N.W.2d 610, 616 (Iowa 2007). Ownership of the lakebed generally depends on whether the lake is considered navigable under the common law.[6] *Id.* As we acknowledged in *Orr*, " 'Navigable water has been likened to a public highway,' 'used or usable as a broad highway for commerce.' " *Id.* (first quoting *McCauley v. Salmon*, 234 Iowa 1020, 1022–23, 14 N.W.2d 715, 716 (1944); and then quoting *Mountain Props., Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1100 (Pa. Super. Ct. 2001)); *accord Estate of McFarlin v. State*, 881 N.W.2d 51, 64 (Iowa 2016).

---

[6]I note that whether a lake is considered navigable under common law is not the same as whether it qualifies as a navigable water as defined in section 462A.2(22).

> "In Iowa, the legal title to the beds of all navigable lakes to the high-water mark is in the state in trust for the use and benefit of the public." But "[i]f a body of water is nonnavigable, it is privately owned by those who own the land beneath the water's surface and the lands abutting it, and may be regulated by them."

*Orr,* 735 N.W.2d at 616 (alteration in original) (citation omitted) (first quoting *State v. Nichols*, 241 Iowa 952, 967, 44 N.W.2d 49, 57 (1950); and then quoting *Mountain Props.,* 767 A.2d at 1099–1100).

Here, the parties do not dispute—and the only evidence in the record to this point shows—that the land surrounding Lake Panorama and the lakebed itself are privately owned by individuals or the Lake Panorama Association (LPA). Thus, for purposes of this case, I presume that Lake Panorama is not a navigable water under Iowa common law.[7] *See id.*

In *Orr,* we held that the owner of a nonnavigable lakebed "is entitled to exclusive use and enjoyment of that portion of the nonnavigable lake covering the lake bed [it] owns" and has the legal right to exclude nonowners from that portion of the lake. *Id.* at 616, 618; *see* 12 Am. Jur. 2d *Boats and Boating* § 28, at 283 (2019) ("[A]s to private or nonnavigable lakes, the owners of the lake bed generally have exclusive boating rights as against the general public. The public may not use a nonnavigable stream flowing over private land for canoeing or other uses without consent of the landowner if no prescriptive easement has been established . . . ." (Footnote omitted.)). We adopted this "common law rule" in *Orr* primarily because it is "consisten[t] with prevailing norms of real estate ownership in this state." *Orr,* 735 N.W.2d at 618. Thus, the owner of Lake Panorama's lakebed—the LPA—may exclude nonowners from accessing the lake's waters covering the lakebed it owns. *See id.* at 616, 618.

---

[7]Of course, this presumption for the purposes of this case does not affect whether Lake Panorama qualifies as a "navigable water" under Iowa Code chapter 462A. *See* Iowa Code § 462A.2(22) (defining "navigable waters" as used in chapter 462A).

The district court concluded that whether a lake "is not open to the use of the general public but is used exclusively by the owners and their personal guests," Iowa Code § 462A.2(31), depends on "whether there exists a right to exclude all but the owners and their personal guests." It then concluded the LPA did not have such a right because members of the public have a right to access Lake Panorama "from a navigable stream inlet, the Middle Raccoon River." The State also makes this argument on appeal, and both relied on an Iowa attorney general opinion from 1962 to support their conclusion.

However, to the extent the district court and the State conclude the LPA has no right to exclude the public from accessing the water covering the lakebed the LPA owns, they are incorrect based on the holding of *Orr*. And their reliance on the 1962 attorney general opinion is misplaced.

The 1962 attorney general opinion addressed whether certain lagoons connected to Lake West Okoboji were Iowa waters under the jurisdiction of the commission. 1962 Op. Iowa Att'y Gen. 55, 55 (1962). The lagoons were connected to the lake and were dug privately, and the land surrounding them was privately owned. *Id.* But the lagoon waters could be directly accessed by boat from the lake. *Id.* The opinion concluded the lagoons were under the commission's jurisdiction because they were navigable waters (as defined in section 462A.2(45)) and were not privately owned lakes. *Id.* at 55–56. That conclusion was predicated upon a finding that the lagoons were part of Lake Okoboji under the law of chapter 462A. *See id.* at 56.

Nevertheless, the attorney general opinion has fallacies and is distinguishable from the present case. First, the opinion completely fails to consider the ownership rights to the lagoons. While Lake West Okoboji is a navigable water under Iowa common law and the public generally has

a right to access common law navigable waters, the attorney general opinion says nothing about whether the lagoons were dug above the high-water mark—i.e., on private property. *See, e.g.*, Iowa Admin. Code r. 571—13.3 (providing that Iowa "holds sovereign title in trust for the benefit of the public to the bed[]" of Lake West Okoboji because it is a "meandered sovereign lake[]"—i.e., "lakes which, at the time of the original federal government surveys, were surveyed as navigable and important water bodies and were transferred to the states upon their admission to the union to be transferred or retained by the public in accordance with the laws of the respective states"); *Orr*, 735 N.W.2d at 615–16; *State v. Sorensen*, 436 N.W.2d 358, 361–63 (Iowa 1989); *see also Wilcox v. Pinney*, 250 Iowa 1378, 1383, 98 N.W.2d 720, 723 (1959) (defining "high-water mark"). Private land above the high-water mark does not automatically become part of the navigable lake's bed—and thus have its title transferred to the state to hold in trust for the public's benefit—merely because the land owner dug an artificial lagoon that connects with the navigable lake. *See Wilcox*, 250 Iowa at 1382–83, 98 N.W.2d at 723 (holding title to riparian lands passes to the state when the river gradually erodes those lands and the river thereafter occupies the space where the lands used to be); *cf. Coulthard v. Stevens*, 84 Iowa 241, 245–46, 50 N.W. 983, 984 (1892) (holding title to riparian lands transferred to a second riparian owner by accretion). And a statute providing otherwise effects a taking without just compensation. *See* U.S. Const. amend. V; Iowa Const. art. I, § 18; *see also Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S. Ct. 383, 393 (1979) (holding the government cannot take the right to exclude from a privately owned water property owner without compensation); *Solomon v. Sioux City*, 243 Iowa 634, 639, 51 N.W.2d 472, 476 (1952) (indicating riparian owner rights are constitutionally protected). Accordingly, the

attorney general opinion was incorrect to the extent that it concluded the lagoons were part of Lake West Okoboji—and therefore waters of Iowa under the commission's jurisdiction—merely because the lagoons met the definition of navigable waters under section 462A.2 and were connected to and accessible from the lake, which also constituted navigable waters under section 462A.2.

Second, even assuming the lagoons could become common law navigable waters upon being connected to and accessible from the common law navigable lake, the attorney general opinion is distinguishable from the present case. The parties do not contend, there is nothing in the record, and there is nothing in the law that indicates the Middle Raccoon River is a common law navigable water, unlike Lake West Okoboji. *See* Iowa Admin. Code r. 571—13.3 (excluding the Middle Raccoon River from the list of "meandered sovereign rivers"—i.e., "rivers which, at the time of the original federal government surveys, were surveyed as navigable and important water bodies and were transferred to the states upon their admission to the union to be transferred or retained by the public in accordance with the laws of the respective states upon their admission to the union"); *see also* Iowa Official Register 1971–1972, at 395–403 (L. Dale Ahern ed.) (excluding the Middle Raccoon River from the list of wildlife refuges, hunting and fishing areas, state parks, and forests under the commission's jurisdiction). Thus, Lake Panorama could not become a common law navigable water merely because it was constructed on, is connected to, and is accessible from a common law nonnavigable water, the Middle Raccoon River.

Third, the attorney general opinion is also not persuasive because it predates *Orr*. One issue addressed in *Orr* was whether Iowa should adopt the common law rule or civil law rule to determine the right of an owner of

part of a nonnavigable lake's bed to use and enjoy the entire lake. 735 N.W.2d at 616. Under the common law rule, the partial owner is entitled to the exclusive use and enjoyment of the portion of the nonnavigable lake over the lakebed he or she owns. *Id.* Under the civil law rule, a partial owner is entitled to reasonably use and enjoy the entire lake. *Id.* at 616–17. We adopted the common law rule. *Id.* at 618.

One party in *Orr* argued that the legislature had already codified the civil law rule in chapter 455B. *Id.* at 617–18. Chapter 455B identifies when water is public. Iowa Code § 455B.262(3) ("Water occurring in a basin or watercourse, or other body of water of the state, is public water . . . ."); *accord Orr,* 735 N.W.2d at 617. And it defines "watercourse" as "any lake, river, creek, ditch, or other body of water or channel having definite banks and bed with visible evidence of the flow or occurrence of water, except lakes or ponds without outlet to which only one landowner is riparian." Iowa Code § 455B.261(17). We noted chapter 455B "expresses the State's policy to protect lives and property from floods and to promote the orderly development, wise use, protection, and conservation of the State's water resources." *Orr,* 735 N.W.2d at 617; *accord* Iowa Code § 455B.262(1). However, because chapter 455B does not expressly address the nature and extent of the property interests of the owners of nonnavigable watercourses, we concluded chapter 455B does not prescribe those property rights. *Orr,* 735 N.W.2d at 617.

Similarly, chapter 462A identifies when water is public. *See* Iowa Code § 462A.3A ("Water occurring in any river, stream, or creek having definite banks and bed with visible evidence of the flow of water is flowing surface water and is declared to be public waters of the state of Iowa . . . ."). Although chapter 462A does not define "river," "stream," or "creek," under the common law, "stream" was often used as a "catch-all" term and could

refer to *natural* lakes. *See, e.g., Noyes v. Collins*, 92 Iowa 566, 568, 61 N.W. 250, 250–51 (1894); *cf. Orr*, 735 N.W.2d at 617 (quoting section 455B.261(17)'s definition of watercourse). But as an artificial lake is not a river, stream, natural lake, or creek, section 462A.3A does not address the nature and extent of the property interests of the private owners of an artificial nonnavigable lake, such as Lake Panorama. *See Orr*, 735 N.W.2d at 617.

Admittedly, *Orr* concerned a *landlocked* nonnavigable lake. *Id.* at 616–18. However, the authorities it cited in support of its legal holdings are unconcerned with whether the water body at issue is landlocked. *See Wehby v. Turpin*, 710 So. 2d 1243, 1246–50 (Ala. 1998); *Ace Equip. Sales, Inc. v. Buccino*, 869 A.2d 626, 632–35 (Conn. 2005); *Anderson v. Bell*, 433 So. 2d 1202, 1204–07 (Fla. 1983); *Lanier v. Ocean Pond Fishing Club, Inc.*, 322 S.E.2d 494, 496 (Ga. 1984); *Sanders v. De Rose*, 191 N.E. 331, 332–34 (Ind. 1934); *Nichols*, 241 Iowa at 966–68, 44 N.W.2d at 57–58; *McCauley*, 234 Iowa at 1022, 14 N.W.2d at 716; *Peck v. Alfred Olsen Constr. Co.*, 216 Iowa 519, 522–27, 245 N.W. 131, 134–37 (1932); *Black v. Williams*, 417 So. 2d 911, 911–12 (Miss. 1982); *Smoulter v. Boyd*, 58 A. 144, 146–47 (Pa. 1904); *Mountain Props.*, 767 A.2d at 1099–1101; *White's Mill Colony, Inc. v. Williams*, 609 S.E.2d 811, 815–17, 820 (S.C. Ct. App. 2005); *Monroe v. State*, 175 P.2d 759, 761–62 (Utah 1946); *Wickouski v. Swift*, 124 S.E.2d 892, 895 (Va. 1962); *Ours v. Grace Prop., Inc.*, 412 S.E.2d 490, 493–95 (W. Va. 1991). Thus, the landlocked nature of the lake in *Orr* should not, alone, preclude application of *Orr* to a nonlandlocked lake.

That conclusion makes sense when reading the statutory definition of "privately owned lakes" in the context of the statutory definition of "farm ponds." The legislature defined "farm ponds" as "a body of water wholly on the lands of a single owner, or a group of joint owners, *which does not*

*have any connection with any public waters* and which is less than ten surface acres." Iowa Code § 462A.2(15) (emphasis added). The legislature enacted this definition of farm pond at the same time it enacted the definition of privately owned lakes at issue in this case. *See* 1961 Iowa Acts ch. 87, § 2 (codified as amended at Iowa Code § 462A.2 (2018)). If the legislature intended for privately owned lakes to only include those that are not connected to any public waters, then it would have said so like it did in the definition of farm pond.

Finally, there are a few administrative regulations that discuss Lake Panorama, but I do not think they are persuasive regarding our task of interpreting privately owned lakes as defined in chapter 462A. Rules 571—16.1 and 16.4 are part of the regulation chapter on docks and other structures "on public waters." *See* Iowa Admin. Code ch. 571—16. In rule 571—16.1, the natural resource commission defined "artificial lake" to mean "all river impoundments and all other impoundments of water to which the public has a right of access from land or from a navigable stream inlet. Examples are Lake Panorama, Lake Delhi, Lake Nashua, and Lake Macbride." *Id.* r. 571—16.1. And rule 571—16.4 establishes the criteria and procedures for obtaining certain dock permits. The rules are intended to implement Iowa Code sections 461A.4, 461A.11, 461A.18, 462A.27, and 462A.32.

Nevertheless, I do not believe that either rule either (1) gives the commission jurisdiction over Lake Panorama or (2) means Lake Panorama is not a privately owned lake. All five of the Iowa Code sections the rules are intended to implement apply only to waters under the jurisdiction of the commission. *See, e.g.,* Iowa Code § 461A.4(1)(*a*) (prohibiting any person from constructing a pier or similar structure "upon or over any *state-owned* or *state-managed* land or *water under the jurisdiction of the*

*commission*" (emphasis added)); *id.* § 461A.11 (providing the commission may accept gifts of land or other property and discussing the jurisdiction of land adjacent to a meandered stream or lake that has been gifted to the public but not to the jurisdiction of a specific agency); *id.* § 461A.18 ("Jurisdiction over all meandered streams and lakes of this state and of state lands bordering thereon, not now used by some other state body for state purposes, is conferred upon the commission."); *id.* § 462A.27 (providing for the removal of nonpermanent structures from the waters under the jurisdiction of the commission); *id.* § 462A.32 (providing rules for buoys on waters under the jurisdiction of the commission). The natural resource commission cannot circumvent the statutory definition of "waters of this state under the jurisdiction of the commission" in chapter 462A in order to dictate that the public has a right to access Lake Panorama by rule. Iowa Code § 462A.2(45) (definition of "waters of this state under the jurisdiction of the commission"); Iowa Admin. Code r. 571—16.1 (definitions of "artificial lake" and "public water body").

In sum, under Iowa common law, when a lakebed is privately owned, the owner may exclude nonowners from the waters covering that portion of the lakebed owned by that private owner. Whether the waters covering that privately owned lakebed are accessible by nonowners from connecting waters or other portions of the lake does not affect the private owner's right to exclude nonowners. Accordingly, under Iowa common law, waters covering a privately owned lakebed are not, by default, open to the use of the general public merely because the general public is logistically able to float into those waters from connecting waters.

Applying the above analysis to this case reveals that Lake Panorama is "not open to the use of the general public but is used exclusively by the

owners and their personal guests." Iowa Code § 462A.2(31). Accordingly, it is a privately owned lake under section 462A.2(31).

Because Lake Panorama is a privately owned lake under section 462A.2(31), it cannot be under the jurisdiction of the commission and section 462A.12(4) does not apply to it. Consequently, the officers could not have observed Meyers violating section 462A.12(4) and, therefore, their alleged basis for probable cause to stop Meyers's vessel is without merit.

I note that my holding does not mean that boaters can boat while intoxicated on private lakes that are not under the commission's jurisdiction. Section 462A.14 provides that a person commits the offense of boating while intoxicated if that person operates a boat while intoxicated "on the navigable waters of this state." *Id.* § 462A.14(1); *see id.* § 462A.2(22) (defining "navigable waters" as used in chapter 462A as "all lakes, rivers, and streams, which can support a vessel capable of carrying one or more persons during a total of six months in one out of every ten years"). In contrast to section 462A.12(4)—the blue light prohibition— section 462A.14's applicability is not limited to the waters of this state under the commission's jurisdiction. *Compare id.* § 462A.12(4) ("No person shall operate *on the waters of this state under the jurisdiction of the conservation commission* any vessel displaying or reflecting a blue light . . . ." (Emphasis added.)), *with id.* § 462A.14(1) ("A person commits the offense of operating a motorboat or sailboat while intoxicated if the person operates a motorboat or sailboat *on the navigable waters of this state* in any of the following conditions . . . ." (Emphasis added.)).

In this case, the only basis for the stop was a violation of section 462A.12(4)'s blue light prohibition. But because the applicability of that provision is expressly limited to only the waters of this state under the commission's jurisdiction and Lake Panorama is not such a water,

Meyers's display of blue lights while boating on Lake Panorama did not give the officers a constitutional basis to stop Meyers.

**III. Whether the Officers Had Reasonable Suspicion to Stop Meyers's Vessel.**

Meyers argues the officers lacked reasonable suspicion to stop his vessel because there was no indication that the purpose of the stop was to investigate criminal activity—i.e., "confirm or dispel suspicions of criminal activity through reasonable questioning." *Krebs*, 650 N.W.2d at 641.

A stop based on reasonable suspicion is often described as a "*Terry* stop" or an "investigatory stop." *E.g., State v. Tyler*, 830 N.W.2d 288, 297–98 (Iowa 2013); *State v. Vance*, 790 N.W.2d 775, 780–81 (Iowa 2010). Reasonable suspicion justifies a warrantless stop to investigate a crime. *Tyler*, 830 N.W.2d at 298. "The principal function of an investigatory stop is to resolve the ambiguity as to whether criminal activity is afoot." *Vance*, 790 N.W.2d at 780 (quoting *State v. Richardson*, 501 N.W.2d 495, 497 (Iowa 1993)). Thus, an investigatory stop based on reasonable suspicion may be constitutional even if the stop does not reveal any unlawful conduct. *Id.* However, as we noted in *Tyler*, the officer conducting a reasonable suspicion stop must expect to learn information about the suspected criminal activity:

> [I]f the officer has a legitimate expectation of investigatory results, the existence of reasonable suspicion will allow the stop—if the officer has no such expectations of learning additional relevant information concerning the suspected criminal activity, the stop cannot be constitutionally permitted on the basis of mere suspicion.

830 N.W.2d at 298 (quoting 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.3(a), at 482 (5th ed. 2012) [hereinafter LaFave]). Moreover, if the stop cannot facilitate "immediate investigation [of the suspected criminal activity] through temporarily

maintaining the *status quo*," *id.* (quoting 4 LaFave § 9.3(a), at 482), then the stop is not valid even if the officer had "a reasonable, articulable suspicion that a criminal act has occurred, is occurring, or is about to occur," *Pettijohn*, 899 N.W.2d at 15 (quoting *Vance*, 790 N.W.2d at 780).

Here, the officers did not have an investigatory purpose for stopping Meyers's vessel. The record reveals that they stopped Meyers's vessel specifically because they believed his boat's display of blue lights violated Iowa Code section 462A.12(4). The State has made no showing that the officers stopped the vessel to *investigate* whether the vessel was indeed displaying blue lights. Nor has the State made a showing that the officers were "attempting to actively investigate whether a[nother] crime was occurring and that [the] seizure was required in order to accomplish that purpose." *Tyler*, 830 N.W.2d at 298. Accordingly, the State cannot rely on reasonable suspicion to justify the stop of Meyers's vessel.

### IV. Whether the Officers' Lack of Probable Cause Is Excusable Because the Officers Made an Objectively Reasonable Mistake of Law.

The State argues that even if section 462A.12(4) does not apply to Lake Panorama and, therefore, the officers based the stop on a mistake of law, this court should reject our precedent under article I, section 8 of the Iowa Constitution, adopt the United States Supreme Court's approach in *Heien v. North Carolina*, 574 U.S. 54, 60–61, 135 S. Ct. 530, 536 (2014), and hold an officer's objectively reasonable mistake of law can justify a stop. Although *Heien* held an objectively reasonable mistake of law may provide *reasonable suspicion* to support an investigatory stop—not probable cause to support a noninvestigatory stop—the State appears to request this court adopt and apply the *Heien* approach to questions of probable cause as well as to questions of reasonable suspicion. *See id.*

We have held a mistake of law does not excuse a lack of probable cause and could not justify a stop under article I, section 8 of the Iowa Constitution. *Tyler*, 830 N.W.2d at 294. One year after we decided *Tyler*, the Supreme Court decided *Heien*, holding a reasonable mistake of law could support reasonable suspicion for a stop. 574 U.S. at 65–67, 135 S. Ct. at 539–40. In two subsequent cases, we acknowledged the *Heien* decision but noted that *Heien* did not affect *Tyler*'s holding under the Iowa Constitution and that *Heien* would be inconsistent with our rejection of the good-faith exception in *State v. Cline*, 617 N.W.2d 277, 292–93 (Iowa 2000), *abrogated on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001). *See State v. Scheffert*, 910 N.W.2d 577, 585 n.2 (Iowa 2018); *State v. Coleman*, 890 N.W.2d 284, 298 n.2 (Iowa 2017).

"Stare decisis alone dictates continued adherence to our precedent absent a compelling reason to change the law." *Book v. Doublestar Dongfeng Tyre Co.*, 860 N.W.2d 576, 594 (Iowa 2015). It requires "the highest possible showing that a precedent should be overruled before taking such a step." *Brewer-Strong v. HNI Corp.*, 913 N.W.2d 235, 249 (Iowa 2018) (quoting *McElroy v. State*, 703 N.W.2d 385, 394 (Iowa 2005)). We must undertake the task of reexamining our precedent "only for the most cogent reasons and with the greatest caution." *State v. Brown*, 930 N.W.2d 840, 854 (Iowa 2019) (quoting *Kiesau v. Bantz*, 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016)).

The State provides three reasons for adopting *Heien*: (1) our article I, section 8 jurisprudence rejecting that approach predated *Heien*; (2) *Tyler* relied on *State v. Louwrens*, 792 N.W.2d 649 (Iowa 2010), for its holding, but the *Louwrens* special concurrence anticipated *Heien*'s reasoning; and

(3) adopting *Heien* would not be inconsistent with our holding in *Cline*. I do not find these three reasons persuasive.

The first two reasons are not persuasive because *Louwrens*, upon which *Tyler* relied, provides compelling reasons to hold that a mistake of law cannot justify a stop. In *Louwrens*, we acknowledged that great deference is given to an officer's assessment of the facts and, as long as that assessment is objectively reasonable, probable cause is established regardless of the officer's subjective motivations. 792 N.W.2d at 652–53. This deference is in large part because of "the recognition that officers are generally in a superior position, relative to courts, to evaluate those facts and their significance." *Heien*, 574 U.S. at 72, 135 S. Ct. at 543 (Sotomayor, J., dissenting). However, "the flip side of that leeway is that the legal justification [to conduct searches and seizures] must be objectively grounded." *Louwrens*, 792 N.W.2d at 653 (quoting *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998)). No mistake of law— reasonable or otherwise—is objectively grounded. *See id.*; *see also United States v. Chanthasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003); *Miller*, 146 F.3d at 279.

The law is the law. It is not susceptible to a reasonableness inquiry, especially not in the criminal context. *See, e.g., State v. Nicoletto*, 845 N.W.2d 421, 427 (Iowa 2014) (acknowledging the "longstanding rule of narrowly construing criminal statutes"), *superseded on other grounds by statute*, 2014 Iowa Acts ch. 1114, § 1 (codified as amended at Iowa Code § 709.15(1)(*f*)). It is axiomatic that judicial interpretation of a statute does not change the law codified in that statute but merely declares what the statute says; otherwise, there would be a separation of powers issue. *See, e.g., Hansen v. Haugh*, 260 Iowa 236, 241, 149 N.W.2d 169, 172 (1967) ("It is not the function of courts to legislate and they are constitutionally

prohibited from doing so." (citing Iowa Const. art. III, § 1)); *Koehler v. Hill*, 60 Iowa 603, 663, 15 N.W. 609, 639 (1883) (Beck, J., dissenting) ("[D]ecisions of courts do not make law, but simply declare what the law is. The judicial theory is that the law as declared by the courts existed and was of force before the decision, and is to be applied to all rights existing and transactions occurring before the decision was made."). In this way, a court's interpretation of a statute applies retroactively and a law enforcement officer's erroneous understanding of the law is not an objectively grounded legal justification for a search or seizure.

Additionally, Justice Sotomayor's dissent in *Heien* reiterated many of the reasons for our decision in *Louwrens*. And these reasons are not adequately countered by the *Heien* majority, concurrence, or the special concurrence in *Louwrens*. This is especially true regarding the practical realities of the *Heien* majority's holding.

Both the *Heien* dissent and *Louwrens* acknowledge the deference given to law enforcement's factual assessments as well as the tempering of that deference by requiring the legal justification be objectively grounded. *See Heien*, 574 U.S. at 72–73, 135 S. Ct. at 542–43; *Louwrens*, 792 N.W.2d at 652–53. Both conclude that deference is given only to factual assessments but not to legal determinations and that mistakes of law are not objectively grounded. *See Heien*, 574 U.S. at 73, 135 S. Ct. at 543; *Louwrens*, 792 N.W.2d at 653.

Justice Sotomayor acknowledges that traffic-type stops can be "annoying, frightening, and perhaps humiliating." *Heien*, 574 U.S. at 73, 135 S. Ct. at 543 (quoting *Terry v. Ohio*, 392 U.S. 1, 25, 88 S. Ct. 1868, 1882 (1968)). But she wonders "how a citizen seeking to be law-abiding and to structure his or her behavior to avoid these invasive, frightening, and humiliating encounters could do so" if officers can "effect seizures so

long as they can attach to their reasonable view of the facts some reasonable legal interpretation (or misinterpretation) that suggests a law has been violated." *Id.* at 74, 135 S. Ct. at 543–44.

Justice Sotomayor also acknowledges that officers may confront situations in which the application of a statute is unclear. *Id.* at 79, 135 S. Ct. at 546. But she—rightfully—wonders "why an innocent citizen should be made to shoulder the burden of being seized whenever the law may be susceptible to an interpretive question." *Id.*

Sometimes a statute is ambiguous and law enforcement must make a best guess as to its meaning. And sometimes, that best guess is incorrect. Law enforcement should not get the benefit of something because they happened to guess wrong when, if they had guessed correctly, they would not be entitled to that benefit. *See Louwrens*, 792 N.W.2d at 653 (noting that adopting a good-faith mistake-of-law exception would remove the incentive for officers to make sure they properly comply with and understand the law); *see also Heien*, 574 U.S. at 79, 135 S. Ct. at 546 (questioning why it is appropriate to place the burden of a statute's ambiguity on individuals); *Louwrens*, 792 N.W.2d at 653 (questioning why it is appropriate to hold a statute's ambiguity against the defendant); *cf. Cline*, 617 N.W.2d at 290 (finding the exclusionary rule deters lax government practices in all three branches).

The State's third reason is not persuasive because *Heien* is inconsistent with our holding in *Cline*. In *Cline*, we declined to adopt the good-faith exception to the exclusionary rule under article I, section 8. 617 N.W.2d at 283. The exclusionary rule prohibits the state from using evidence gained through an unconstitutional search or seizure in the criminal prosecution of the defendant. *See id.* (citing *Weeks v. United States*, 232 U.S. 383, 393–94, 34 S. Ct. 341, 344–45 (1914)).

Under Fourth Amendment jurisprudence, the purpose of the rule is to deter police misconduct, and it is not "a personal constitutional right of the party aggrieved." *Id.* at 284 (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974)). Whether the exclusionary rule applies is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." *United States v. Leon*, 468 U.S. 897, 906, 104 S. Ct. 3405, 3412 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 223, 103 S. Ct. 2317, 2324 (1983)).

The good-faith exception is an exception to the exclusionary rule under Supreme Court precedent. *Id.* at 913, 104 S. Ct. at 3415. In *Leon*, the Court adopted the good-faith exception to allow the prosecution to offer evidence seized by officers who reasonably relied on a warrant that was ultimately determined to be invalid. *Id.* at 922, 104 S. Ct. at 3420. And in *Illinois v. Krull*, the Court applied the good-faith exception and did not require suppression of evidence from a warrantless search authorized by a state statute that was subsequently declared unconstitutional. 480 U.S. 340, 349–50, 107 S. Ct. 1160, 1167 (1987). In both situations, the exception's applicability depended on whether the officer's reliance on the warrant or statute was reasonable. *Leon*, 468 U.S. at 922–23, 104 S. Ct. at 3420–21; *see Krull*, 480 U.S. at 349–50, 107 S. Ct. at 1167.

In *Cline*, we rejected the good-faith exception under article I, section 8 because we found the Court's reasoning in *Leon* and *Krull* faulty. *Cline*, 617 N.W.2d at 288–93. First, we disagreed with the Court that the rule's sole purpose is to deter police misconduct. *Id.* at 289–90. Instead, we concluded the rule also serves as a remedy for the constitutional violation and protects the integrity of the courts by keeping them from condoning the constitutional violation and "allow[ing] law enforcement to enjoy the

benefits of the illegality." *Id.* We also noted that the rule "serves a deterrent function even when the police officers act in good faith" and, therefore, "to adopt a good faith exception would only encourage lax practices by government officials in all three branches of government." *Id.* at 290.

Next, we highlighted several undesirable consequences of the good-faith exception. *Id.* at 290–92. We reasoned that allowing the results of an unconstitutional search or seizure to be introduced "would effectively defeat the purpose of the search and seizure clause" because the exception replaces the probable-cause standard with a "close enough is good enough" standard. *Id.* at 290 (quoting *State v. Marsala*, 579 A.2d 58, 68 (Conn. 1990)). We also acknowledged that adoption of the exception would leave those subjected to an unconstitutional search and seizure based on good faith without any remedy. *Id.* at 291. Notably, we did recognize that the exclusionary rule does not cure the constitutional violation, but it is nonetheless the best remedy available. *Id.* at 289. We were further concerned that adoption of the exception would allow courts to bypass the constitutional inquiry—i.e., whether the search or seizure was constitutional—and uphold the admission of the evidence based on the officer's good faith. *Id.* at 291–92. We noted this would lead to less guidance for law enforcement and judicial officers on the parameters of reasonable searches and seizures and would gradually erode the constitutional protection. *Id.*

Third, we identified the fallacies with the *Leon* Court's cost-benefit analysis. *Id.* at 292. We noted the Court's conclusion that the costs of exclusion would be substantial was not supported by studies attempting to qualify the number of prosecutions that were adversely affected by exclusion of unconstitutionally obtained evidence. *Id.* But more

importantly, we clarified that the costs of exclusion are properly attributed to the constitutional provision, not the exclusionary rule. *Id.*

We concluded by finding that the good-faith exception is incompatible with article I, section 8. *Id.* at 292–93. We affirmatively stated,

> We believe that the only effective way to ensure that this right is more than mere words on paper is to exclude illegally obtained evidence. The reasonableness of a police officer's belief that the illegal search is lawful does not lessen the constitutional violation. . . . This court will simply not "condone and approve a clear and known violation of a fundamental constitutional right in order to sustain a conviction that we think correct." To do so would elevate the goals of law enforcement above our citizens' constitutional rights, a result not supported by any principle of constitutional law.

*Id.* (quoting *State v. McClelland*, 164 N.W.2d 189, 200 (Iowa 1969) (Becker, J., dissenting), *overruled in part by State v. Bester*, 167 N.W.2d 705, 707–08 (Iowa 1969)).

The principles elucidated in and the reasoning of *Cline* apply with the same force to what is essentially a proposed good-faith mistake-of-law exception to article I, section 8's probable-cause requirement. This is so even though the mistake-of-law inquiry goes to whether the search or seizure was constitutional, whereas the good-faith exception to the exclusionary rule goes to whether there is a remedy for an unconstitutional search or seizure. *See Heien*, 574 U.S. at 74–75, 135 S. Ct. at 544–45.

Adopting such an exception would replace the probable-cause standard with a "close enough is good enough" standard. *Cline* portends that close is only good enough in horseshoes and hand grenades, not when it comes to complying with constitutional requirements. *See* 617 N.W.2d at 290–91.

And most importantly, *Cline* specifically stated that "[t]he reasonableness of a police officer's belief that the illegal search [or seizure] is lawful does not lessen the constitutional violation." *Id.* at 292. The fact of the matter is that the officers stopped Meyers's vessel without probable cause (or reasonable suspicion). That should be the end of the inquiry of whether the stop violated article I, section 8.

The State has not persuaded me that we should abandon our recently reaffirmed precedent when there has been no showing that that precedent is fallible. At most, the State attacks our precedent by noting that Meyers's case is one where it is difficult to discern between a mistake of law and a mistake of fact. However, assuming that is true, the State does not explain why that fact in this one case should compel us to overturn our precedent. It is axiomatic that we decide the law not only for the case presently before, but for future cases as well. The State has not demonstrated—or even truly argued—that our current approach has repeatedly proven unworkable because it is too difficult to distinguish mistakes of fact and mistakes of law.

Other procedural mechanisms are available to the State to get around an officer's mistake of law. For example, the State is not limited to only the officer's stated reasons for the stop when arguing there was probable cause or reasonable suspicion but may proffer various alternative reasons for why the stop was justified. *Tyler*, 830 N.W.2d at 295; *State v. Heminover*, 619 N.W.2d 353, 357 (Iowa 2000), *abrogated on other grounds by Turner*, 630 N.W.2d at 606 n.2; *see Brown*, 930 N.W.2d at 847. Similarly, subject to waiver and error preservation rules, a district court and the reviewing appellate court may also rely on any of the proffered alternative reasons in concluding there was probable cause or reasonable suspicion. *See Tyler*, 830 N.W.2d at 295; *see also Hawkeye Foodserv.*

*Distribution, Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 609–10 (Iowa 2012). Accordingly, the State can show the stop was justified in spite of the mistake of law.

Relatedly, law enforcement face no punishment for a good faith mistake of law such that adopting a good-faith mistake-of-law exception to the probable-cause requirement is necessary to protect officers. *See Heien*, 574 U.S. at 75, 135 S. Ct. at 544. And it is likely such an officer would have a defense against any claim of civil liability. *See id.*; *Baldwin v. City of Esterville*, 915 N.W.2d 259, 260–61 (Iowa 2018); *see also Cline*, 617 N.W.2d at 291.

Finally, our decision not to overturn our precedent is consistent with our sister states that have not overturned their prior holdings under their state constitutions after *Heien*. *See, e.g.*, *State v. Pettit*, 406 P.3d 370, 375–76 (Idaho Ct. App. 2017) (among other things, holding that the Idaho Constitution does not contain a good-faith exception for an officer's mistake of law and explaining that adopting *Heien* would be inconsistent with the Idaho Supreme Court's rejection of the good-faith exception under the Idaho Constitution); *State v. Heilman*, 342 P.3d 1102, 1106 n.5 (Or. Ct. App. 2015) (noting the trial court would be incorrect if it had thought the officer's good-faith mistake of law gave the officer probable cause to stop the defendant); *cf. State v. Scriven*, No. A–5680–13T3, 2015 WL 773824, at *3–4 (N.J. Super. Ct. App. Div. Feb. 25, 2015) (per curiam) (continuing to rely on pre-*Heien* New Jersey Superior Court precedent to conclude the officer's good-faith mistaken interpretation of the statute did not justify the otherwise illegal stop), *aff'd on other grounds by* 140 A.3d 535, 538 (N.J. 2016) (declining to reach *Heien* issue); *State v. Sutherland*, 176 A.3d 775, 776 (N.J. 2018) (again declining to reach *Heien* issue); *State v. Tercero*, 467 S.W.3d 1, 10–11 (Tex. App. 2015) (declining to adopt *Heien*

as an exception to a state rule of procedure that prohibited admission of evidence obtained unconstitutionally); *State v. Brown*, 432 P.3d 1241, 1249 (Wash. Ct. App.) (predicting that the Washington Supreme Court would not allow a mistake of law to supply reasonable suspicion because that court has stated that the Washington Constitution goes further than the Fourth Amendment and "requires actual authority of law before the State may disturb the individual's private affairs"), *rev'd on other grounds by* 454 P.3d 870, 871 (Wash. 2019).

I conclude we should not overrule *Tyler*. Therefore, the officers' mistake of law regarding section 462A.12(4)'s applicability does not provide the necessary probable cause to justify their stop of Meyers's vessel and the stop violated article I, section 8. The district court should have granted Meyers's motion to suppress under the Iowa Constitution.

Appel, J., joins this dissent.