# IN THE SUPREME COURT OF IOWA

No. 140 / 04-1968

Filed July 20, 2007

STEPHEN L. ORR, SHIRLEE ORR,
RONALD E. CAMERON, RANDY
SEVDE, and COLLEEN KATERIE
SEVDE,

      Appellees,

v.

JEFFREY MORTVEDT and
SUSAN MORTVEDT,

      Appellants.

---

Appeal from the Iowa District Court for Hamilton County, Timothy J. Finn, Judge.

The defendants appeal from the district court's ruling declaring the property interests of multiple owners of a lake formed in an abandoned quarry. **AFFIRMED.**

Robert W. Goodwin of Goodwin Law Office, P.C., Ames, for appellants.

William J. Koehn and Heather L. Palmer of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellees.

**HECHT, Justice.**

The defendants appeal from the district court's ruling denying their request for reformation of a deed and declaring: (1) they have the right to use and enjoy only that portion of a man-made lake covering an abandoned rock quarry within the legal description of their deed; (2) the plaintiffs may erect a fence, berm or other structure in the lake marking the borders of their properties; and (3) the plaintiffs may drain the water covering their respective properties and reopen the quarry. We affirm.

## I.  *Background Facts.*

The Twedt family owned a rock quarry and land surrounding it in Hamilton County. The mining of the quarry was discontinued, and the excavated area consisting of approximately thirty acres became a lake filled by ground water springs and normal rainwater run-off. The Twedt family subsequently sold the real estate in a series of transactions over a period of years. Each of the transactions resulted in the conveyance of a portion of the lake bed and land surrounding it.

In the first transaction, Randy Sevde and Colleen Katerie Sevde purchased approximately twenty acres of the lake bed along with adjacent land situated east, south and west of the lake in 1994. In the second transaction in the series, Jeffrey and Susan Mortvedt purchased a tract west and north of the lake, including the northern tip of the lake bed, in 1996. In 1998, Stephen and Shirlee Orr acquired a parcel situated primarily on the east side of the lake and including that part of the lake bed located between the parts previously purchased by the Sevdes and the Mortvedts. In the last conveyance of relevance to this case, the Orrs soon thereafter conveyed a portion of the property they had acquired, including a part of the lake bed, to Ronald Cameron.

A boundary dispute arose between the Mortvedts and the Orrs. The Mortvedts contended their property extended to the water's edge on the west side of the lake. The Orrs disagreed, claiming a survey undertaken and filed of record at the time of the Mortvedts' purchase confirms that the Mortvedts' east boundary line lies west of the water's edge and establishes that the Orrs own a narrow strip of land on the west side of the lake. This boundary dispute escalated when the Orrs cut down trees and planted other vegetation on the disputed narrow strip of land. Disharmony also resulted from the neighbors' inability to agree about their respective rights to use the lake. The Sevdes and the Orrs objected when the Mortvedts used, for fishing and boating, parts of the lake beyond the boundaries of the lake bed owned by the Mortvedts.

The Orrs, the Sevdes, and Cameron filed this action seeking: (1) a resolution of the boundary dispute between the Orrs and the Mortvedts; (2) an adjudication of whether the owners of the lake bed have a legal right to access the entire lake or only that portion of the lake within the legal descriptions of their respective deeds; (3) a declaration that they have the right to drain the water covering their property and fence it; (4) a determination that they are entitled to exclusive possession, use and enjoyment of the minerals located within their respective properties; and (5) compensatory damages for trespass and injunctive relief to prevent future trespasses by the Mortvedts.

The Mortvedts filed a counterclaim seeking a declaration that: (1) they have a legal right to use the entire lake; (2) the plaintiffs have no right to drain the water from the lake and reopen the quarry; (3) the plaintiffs be required to restore the lake water level to that which prevailed when the Mortvedts purchased their property in 1996; and (4) the plaintiffs have no legal right to install or maintain a fence in the lake. The Mortvedts also

sought reformation of their deed to conform it to the understanding of the parties to the 1996 conveyance: that the Mortvedts' east property line extends to the lake water's west edge. They also requested compensatory damages for the loss of the trees removed by Stephen Orr from the narrow strip of land claimed by both the Mortvedts and the Orrs.

After a bench trial, the district court filed a decision declaring in relevant part: (1) the parties are entitled to the exclusive possession, use and enjoyment of the water covering the real estate described in their respective deeds; (2) the parties own any minerals located on the real estate described in their respective deeds; (3) the Mortvedts are prohibited, absent express written permission, from entering upon or using the water overlaying the properties owned by the Sevdes, the Orrs, and Cameron, who are legally entitled to construct a fence, berm or other structure to mark the boundaries of their properties; and (4) the Sevdes, the Orrs, and Cameron are entitled to drain the water covering, mine minerals from, and restore wetlands upon their properties. The court denied the defendants' counterclaim.

The Mortvedts appeal, contending the district court erred in concluding: (1) the lake is not "public water" as defined by Iowa Code sections 455B.261(17) and 455B.262(3) (2003); (2) their deed should not be reformed; and (3) they are not entitled to damages for the loss of the trees destroyed by Stephen Orr.

## II. Scope of Review.

This case was filed and tried in equity. Our review is de novo. *Breitbach v. Christenson*, 541 N.W.2d 840, 843 (Iowa 1995).

5

***III.  Discussion.***

*A.  Reformation of the Mortvedt Deed.*

The Mortvedts contend the district court erred in failing to reform their deed to locate the boundary between their property ("Parcel C") and that of the Orrs ("Parcel B") at the water's edge on the west side of the lake. As the parties seeking reformation, the Mortvedts introduced evidence and requested a finding that their deed does not describe the intended boundary line. *See Kendall v. Lowther*, 356 N.W.2d 181, 187 (Iowa 1984) (stating that the party seeking reformation bears the burden of establishing by clear and convincing evidence that a written instrument fails to reflect the contracting parties' intent).  The Mortvedts offered evidence tending to prove their grantor intended the water's edge on the west side of the lake would be the eastern boundary of the property conveyed to the Mortvedts.  This evidence included the contract between the grantor-estate and the Mortvedts describing the property to be conveyed as "[i]ncluding all land west and north of [the] water."  The Mortvedts also offered the testimony of Loren Twedt, a co-executor of the grantor-estate, and Eldon Boswell, a realtor for the estate, who both affirmed such intent. The plaintiffs objected to the Mortvedts' offer of the real estate contract and the testimony of Mr. Boswell and Mr. Twedt on the grounds that such evidence violated the parol evidence rule and the statute of frauds.

In its decision rejecting the Mortvedts' prayer for reformation of their deed, the district court concluded Boswell's testimony and the real estate contract violated both the parol evidence rule and the statute of frauds. The court also concluded the remedy of reformation is not available to the Mortvedts because the Orrs, whose property interest in the disputed strip of land would be directly affected if the remedy were granted, were not parties to the Mortvedts' deed.

We need not address the Mortvedts' contention that the district court erred in its ruling on the parol evidence and statute of frauds objections because the district court correctly concluded the remedy of reformation is unavailable to the Mortvedts under the circumstances of this case. We will only order reformation of a deed against a party to it, a person in privity with a party, or a person with notice of the relevant facts. *See Burner v. Higman & Skinner Co.*, 133 Iowa 315, 316, 110 N.W. 580, 580 (1907). Reformation will not be ordered to the prejudice of innocent third persons. 76 C.J.S. *Reformation of Instruments* § 54 (1994); *see also Lee v. Brown*, 482 So. 2d 293, 297 (Ala. 1985) (declining to reform a deed to the detriment of an adjoining landowner who was an innocent purchaser); *Statler v. Painter*, 133 S.W.3d 425, 429 (Ark. Ct. App. 2003) (same); *Schlenz v. Dzierzynski*, 481 N.E.2d 287, 290 (Ill. App. Ct. 1985) (same); *Chandelle Enters. LLC v. XLNT Dairy Farm, Inc.*, 699 N.W.2d 241, 247-48 (Wis. Ct. App. 2005) (same). Notwithstanding the Mortvedts' assertions to the contrary, we find the Orrs were innocent third parties as to the transaction between the Twedt estate and the Mortvedts.

Stumbo & Associates Land Co. was hired to prepare a survey when the Mortvedts purchased their land from the Twedt estate in 1996. That survey of Parcels B and C describes the real estate by metes and bounds and denotes the boundary between the parcels as a straight line running from essentially north to south, as shown on the illustration below:



The legal description of Parcel C in the Mortvedts' deed to Parcel C refers expressly to the Stumbo survey.

The Mortvedts contend, however, that the Stumbo survey put the Orrs on inquiry notice of the Mortvedts' claim that the boundary between the two parcels is marked by the water's edge rather than the straight, solid boundary line shown on the survey. The Mortvedts support their position by reference to a dotted line denominated by the surveyor as "edge of water" and drawn on the survey adjacent to the straight, solid line to illustrate the approximate location of the water's edge on the west side of the lake. Although the survey did note in this way the approximate location of the water's edge in relation to the east boundary line identified in the Mortvedts' deed, we conclude the Orrs were not on inquiry notice of any mutual mistake made by the grantor-estate and the Mortvedts in the deed's description of that boundary line.

A reasonably prudent person would interpret the survey as an illustration of the boundary legally described in the Mortvedts' deed and as confirmation that the Mortvedts had not acquired from their grantor the narrow strip of land on the west side of the lake that is the subject of this dispute. Nothing stated or illustrated in the Mortvedts' recorded deed and survey would cause a prudent subsequent purchaser to further inquire into the deeding parties' intentions and to consequently discover any discrepancy between those intentions and the legal description in the deed. *See Bedford v. Kravis*, 622 So. 2d 291, 295 (Miss. 1993) ("[I]f in any . . . deed or conveyance there is contained any recital sufficient to put a reasonably prudent man on inquiry as to the sufficiency of the title, then he is charged with notice of all those facts which could and would be disclosed by a diligent and careful investigation." (emphasis removed)); 76 C.J.S. *Reformation of Instruments* § 58 ("[A] party is not an innocent purchaser if he . . . was conscious of having the means [to discover a mutual mistake] and did not use them as an ordinarily prudent and diligent person would have done, or if there were circumstances sufficient to put him on inquiry [notice of the deeding parties' mistake]."); *cf. Luker v. Moffett*, 38 S.W.2d 1037, 1041-42 (Mo. 1931) (reforming a deed where a purchaser was on inquiry notice of the boundary line). Indeed, contrary to the Mortvedts' contention, the survey and deed taken together would lead a reasonable person to believe the Mortvedts' east boundary did not extend to the water's edge. The surveyor's notation of the "edge of water" provided express notice on the face of the survey that the metes and bounds description of the property purchased by the Mortvedts did not extend eastward to the edge of the water. Because the Orrs were not on inquiry notice of the claimed mistake in the legal description within the Mortvedts' deed, they were innocent

purchasers whose property interest in the narrow strip of land at issue in this case cannot be compromised by reformation of the Mortvedts' deed.

Our resolution of this issue dictates that we must affirm the district court's determination that the Mortvedts have no claim for damages as a consequence of Stephen Orr's removal of trees from the narrow strip of land on the west side of the lake.

*B. Ownership of the Lake Bed; Use and Control of the Lake Water.*

We next address the parties' competing legal claims as to their rights to access the surface waters of the lake for boating and fishing, to fence or otherwise establish physical boundaries on the surface of the lake demarcating their respective claims to ownership of parts of the lake bed, and to drain the water from the lake. As we have noted, the district court concluded the parties have a legal right to go upon and use only the water overlaying the lake bed they own; and consequently, without the consent of the other lake bed owners, the Mortvedts may not go upon or use the water overlaying the plaintiffs' property.

The public generally has a right of access to navigable watercourses. *See State v. Sorensen*, 436 N.W.2d 358, 361-63 (Iowa 1989) (concluding the public trust doctrine requires the State to protect the public's right to use navigable watercourses). Accordingly, if the lake at issue in this case is navigable, the plaintiffs have no right to exclude the Mortvedts from using and enjoying any part of it. The determination of whether a watercourse was navigable at common law depended on the presence or absence of the tidal ebb and flow of water. *McManus v. Carmichael*, 3 Iowa 1, 3-6 (1856). But the jurisprudence of this country has extended the definition of "navigable" to refer to watercourses "susceptible of use for purposes of commerce" or "possess[ing] a capacity for valuable floatage in the

transportation to market of the products of the country through which it runs." *Monroe v. State*, 175 P.2d 759, 761 (Utah 1946) (internal quotation marks and citation omitted). "Navigable water has been likened to a public highway," *McCauley v. Salmon*, 234 Iowa 1020, 1022-23, 14 N.W.2d 715, 716 (1944), "used or usable as a broad highroad for commerce." *Mountain Props., Inc., v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1100 (Pa. Super. Ct. 2001). The landlocked body of water which is the subject of this case consists of only approximately thirty acres and has never served as a highway of commerce. It has been used primarily for recreational purposes and is clearly nonnavigable.

The navigable or nonnavigable status of a watercourse generally determines whether the bed of a watercourse is owned by the state or by private parties. "In Iowa, the legal title to the beds of all navigable lakes to the high-water mark is in the state in trust for the use and benefit of the public." *State v. Nichols*, 241 Iowa 952, 967, 44 N.W.2d 49, 57 (1950); *accord Peck v. Alfred Olsen Constr. Co.*, 216 Iowa 519, 529, 245 N.W. 131, 136 (1932) (noting the legal title to a navigable lake is in the state). But "[i]f a body of water is nonnavigable, it is privately owned by those who own the land beneath the water's surface and the lands abutting it, and may be regulated by them." *Mountain Props., Inc.*, 767 A.2d at 1099-1100. The nonnavigable lake in this case is thus privately owned by the parties because each of their deeds includes part of the lake bed.

We have not previously been asked to decide the fighting issue presented by the parties now before the court: Whether the owner of part of the bed of a nonnavigable lake has the legal right to use and enjoy the entire lake, or only that part covering the lake bed described in his deed? The authorities on this issue are divided. The majority rule, often referred to as the "common law rule," dictates that one is entitled to exclusive use

and enjoyment of that portion of the    nonnavigable lake covering the lake bed one owns.  *Wehby v. Turpin*, 710 So. 2d 1243, 1247 (Ala. 1998); *Ace Equip. Sales, Inc. v. Buccino*, 869 A.2d 626, 634 (Conn. 2005); *Anderson v. Bell*, 433 So. 2d 1202, 1204 (Fla. 1983); *Lanier v. Ocean Pond Fishing Club, Inc.*, 322 S.E.2d 494, 496 (Ga. 1984); *Sanders v. De Rose*, 191 N.E. 331, 333 (Ind. 1934); *Black v. Williams*, 417 So. 2d 911, 912 (Miss. 1982); *Mountain Props., Inc.*, 767 A.2d at 1099; *Smoulter v. Boyd*, 58 A. 144, 146-47 (Pa. 1904); *White's Mill Colony, Inc. v. Williams*, 609 S.E.2d 811, 818 (S.C. Ct. App. 2005); *Wickouski v. Swift*, 124 S.E.2d 892, 894 (Va. 1962); *Ours v. Grace Prop., Inc.*, 412 S.E.2d 490, 494 (W. Va. 1991).  In jurisdictions following the common law rule, owners of the lake bed may fence off their lake bed to promote their exclusive use and enjoyment.  The common law rule thus conforms to the familiar legal maxim *cujus est solum, ejus est usque ad coelum et ad inferos*—"[w]hoever owns the soil owns everything up to the sky and down to the depths."  *Nichols v. City of Evansdale*, 687 N.W.2d 562, 566 (Iowa 2004) (citing *Black's Law Dictionary* 1712 (8th ed. 2004)).

A lesser number of jurisdictions have adopted what has been described as the "civil law rule."[1]  This rule holds that owners of any part of a nonnavigable lake are entitled to reasonable use and enjoyment of the entire surface of the lake, not merely that part covering the bed they own. *Duval v. Thomas*, 114 So. 2d 791, 795 (Fla. 1959); *Beacham v. Lake Zurich Prop. Owners Ass'n*, 526 N.E.2d 154, 157 (Ill. 1988); *Beach v. Hayner*, 173

---

[1]One scholar has noted that the rule commonly referred to as the "civil law rule" was not derived from either the civil law tradition of post-Roman continental Europe or ancient Rome, but rather from decisions of Scottish courts in the nineteenth century, and that the "common law rule," which pre-dates the English common law, actually originated in Roman civil law. *See* Nicholas Harling, *Non-navigable Lakes and the Right to Exclude: The Common Misunderstanding of the Common Law Rule*, 1 Charleston L. Rev. 157, 176-77 (2007).  While we have no quarrel with the author's historical analysis, we choose to refer to the two rules by the names ascribed to them by other American courts.

N.W. 487, 488-89 (Mich. 1919); *Snively v. Jaber*, 296 P.2d 1015, 1019 (Wash. 1956).

The Mortvedts contend our legislature has codified the civil law rule in Iowa Code chapter 455B. Iowa Code section 455B.262(3) (2003) provides:

> Water occurring in a basin or watercourse, or other body of water of the state, is public water and public wealth of the people of the state and subject to use in accordance with this chapter, and the control and development and use of water for all beneficial purposes is vested in the state, which shall take measures to ensure the conservation and protection of the water resources of the state. These measures shall include the protection of specific surface and groundwater sources as necessary to ensure long-term availability in terms of quantity and quality to preserve the public health and welfare.

"Watercourse" is defined in the same chapter to include

> any lake . . . or other body of water or channel having definite banks and bed with visible evidence of the flow or occurrence of water, except lakes or ponds without outlet to which only one landowner is riparian.

Iowa Code § 455B.261(17). The Mortvedts assert the lake in this case fits neatly within the definition of a watercourse. The body of water has several riparian land owners, definite banks, and a bed. As it is filled with water at all times, the lake must be said to have a "visible occurrence of water." An outlet located in the southwest corner of the lake allows water to escape and flow toward a nearby creek if the volume of water should exceed the capacity of the lake's banks.

We conclude the district court correctly rejected the Mortvedts' contention. Chapter 455B expresses the State's policy to protect lives and property from floods and to promote the orderly development, wise use, protection, and conservation of the State's water resources. The statute does not expressly address the nature and extent of the property interests of multiple owners of landlocked nonnavigable lakes. We are not persuaded

that the legislature intended for chapter 455B to prescribe the relative rights of multiple owners to use and enjoy landlocked privately owned watercourses.

In the absence of legislative direction on the issue, we must determine whether the common law rule or the civil law rule should prevail in Iowa. Advocates of the civil law rule claim it is to be preferred because it avoids "the difficulties presented by attempts to establish and obey definite property lines." *Beacham*, 526 N.E.2d at 157. Where, as in the case now before the court, multiple parties claim an ownership interest in an unfenced lake, it may be difficult to discern precisely where the boundaries of one's property are located. The civil law rule avoids this problem by granting the owner of part of a nonnavigable lake bed access to the entire lake. The rule arguably "promotes rather than hinders the recreational use and enjoyment of lakes." *Id.* Perhaps more importantly, the civil law rule discourages the placement of fences or other barriers along boundary lines in the water that "frustrate the cooperative and mutually beneficial use" of water resources, *id.*, and arguably promotes the aesthetic enjoyment of those who use them.

Notwithstanding the notable positive features of the civil law rule, however, we reject it and join the majority of jurisdictions that have adopted the common law rule. The principal advantage of the rule we adopt today is its consistency with prevailing norms of real estate ownership in this state. The common law rule recognizes the legal significance of property boundaries and protects the interests of owners when neighbors are unwilling or unable to coexist cooperatively. Finally, we adopt the common law rule as the default rule, realizing that the several owners of nonnavigable lakes may bargain among themselves to adopt other mutually

acceptable arrangements for the use and mutual enjoyment of water resources.

### IV. Conclusion.

The Mortvedts' deed cannot be reformed under the circumstances of this case. The district court correctly concluded: (1) the plaintiffs have the legal right to exclude the Mortvedts from access to parts of the lake covering the lake bed owned by the plaintiffs; (2) the plaintiffs are legally entitled to drain and fence the water covering their respective properties and reopen the quarry; and (3) the Mortvedts' damage claim for the destruction of trees on land owned by the Orrs is without merit.

**AFFIRMED.**

All justices concur except Cady, J., who dissents.

#140/04-1968, *Orr v. Mortvedt*

**CADY, J. (dissenting).**

I respectfully dissent from the majority's adoption of the common law rule regarding littoral rights in nonnavigable waters in Iowa. The decision of the majority is based largely on its allegiance to "one of the oldest rules of property known to the law that the title of the owner of the soil extends, not only downward to the center of the earth, but upward *usque ad coelum.*" *Hannabalson v. Sessions*, 116 Iowa 457, 461, 90 N.W. 93, 95 (1902). The "logical extension" of this rule leads one to conclude "[a]n owner 'is entitled to exclusive dominion over his land, including the areas above and below its surface.'" Andrea B. Carroll, *Examining a Comparative Law Myth: Two Hundred Years of Riparian Misconception*, 80 Tul. L. Rev. 901, 907 (2006) (citation omitted) [hereinafter Carroll]. Indeed, the logical extension of the rule in this case leads the majority to conclude lake bed owners of nonnavigable lakes have absolute ownership in the waters above their lands. But such an extension is not justified because it is based on the anachronistic rule that our property rights " 'extend from heaven to hell.'" *Id.* (citation omitted). The march of time, the evolution of society, and the inherent differences between land, water, and air clearly demonstrate they do not. The majority's adoption of what is called the "common law rule" only furthers this antiquated abstraction. *See id.* at 940 (suggesting the common law rule should be called "the Roman rule," "traditional rule" or "exclusive dominion" rule instead).

Moreover, the application of such a rule to Iowa today is unreasonable. As the majority recognizes, the rule presents difficulties in "attempt[ing] to establish and obey definite property lines," and leads to "impractical consequences," such as the "erection of booms, fences, or barriers." *Beacham v. Lake Zurich Prop. Owners Ass'n*, 526 N.E.2d 154,

231–32 (Ill. 1988). The Scots recognized and solved this problem long ago. *See* Carroll, 80 Tul. L. Rev. at 927 ("[T]he rule of free access to the surface of nonnavigable lakes has its genesis nowhere but in the Scottish legal system, and that it was born out of the Scots' desire to simplify the problems of boundary demarcation and enforcement on those water bodies."). Their solution was embodied in what could be called the "free access" rule, or what the majority calls the "civil law rule." *See id.* at 940 (suggesting the civil law rule should be called the "Scottish rule," the "modern rule," or the "free access" rule). The reasonableness of the free access rule is readily apparent—even to the majority. The majority correctly recognizes it "promotes rather than hinders the recreational use and enjoyment of lakes." *Beacham*, 526 N.E.2d at 232. In addition, *vis à vis* the exclusive dominion rule, it has several recognized advantages:

(1) the [exclusive dominion] rule is too difficult to follow with regard to lakes; (2) there can be no private ownership in the waters or in the fish of a nonnavigable lake and, thus, use of the surface should be open to all riparian landowners, (3) common use of the surface of nonnavigable lakes is customary; [and] (4) economic policy requires the adoption of the [free access rule].

Carroll, 80 Tul. L. Rev. at 910 (footnotes omitted).

Nevertheless, the majority adopts the exclusive dominion rule. It reasons that the principle is the "majority" rule, that owners could modify the rule by private agreement, and that it comports with the property norms in this state. In my view, these arguments are unpersuasive. First, the traditional rule is definitely not, when put into context, the "majority" rule. *See* Nicholas Harling, *Non-Navigable Lakes & the Right to Exclude: The Common Misunderstanding of the Common Law Rule*, 1 Charleston L. Rev. 157, 170 & n.88, 183 (recognizing most courts have adopted the common

law rule, but that because "many other[] [courts] have been unduly influenced by the common law rule's historic mislabeling and a mistaken belief that their decision places the state's law squarely within the common law tradition . . . no true majority rule exists in America"). Second, the parties in this case clearly demonstrate that a private agreement between them is nearly impossible so that when cases like this arise there really is no other choice.

Finally, if the exclusive dominion rule is consistent with our prevailing norms regarding real estate ownership, it is only because it is based on an antiquated concept that fails to consider the nature of the property in this case. The rule finds no support from those perhaps most familiar with littoral rights. *See* Carroll, 80 Tul. L. Rev. at 919–27 (explaining the Scots' adoption of a free access rule regarding Scottish lochs); *Johnson v. Seifert*, 100 N.W.2d 689, 696–97 (Minn. 1960) (adopting the free access rule for the "land of a thousand lakes," but also noting that it would not apply to "[a] minor body of water which by its nature and character reasonably has no overall utility common to two or more abutting owners"). It also fails to recognize the distinction between water and land. *See* Carroll, 80 Tul. L. Rev. at 910 & n.50 (explaining why the "common law rule is too difficult to follow with regard to lakes").

Perhaps most importantly, the free access rule is not detrimental to prevailing norms. *See* Eric T. Freyfogle, *The Particulars of Owning*, 25 Ecology L.Q. 574, 585 (1999) ("This trend of tailoring rights to the land poses little real threat to the core values of property. Once people see what is going on, once they realize that property rights now depend in part on the land itself, expectations can be adjusted and life can go on, with as much economic growth, personal privacy, and civic harmony as ever before.") [hereinafter Freyfogle]. In fact, I do not believe a free access rule would

necessarily limit the existing property rights of lake bed owners, such as the Orrs in this case. The free access rule simply "permits a riparian landowner 'to use the surface of the entire lake for fishing, boating, and bathing as long as he does not unduly interfere with the rights of the other [riparian landowner] proprietors.'" Carroll, 80 Tul. L. Rev. at 909–10 (quoting James W. Cullis, Note, *Extent of Private Rights in Nonnavigable Lakes*, 5 U. Fla. L. Rev. 166, 176 (1952)).

Property law is not set in stone, but depends "entirely on the law of the nation" where the property is located. *Johnson & Graham's Lessee v. M'Intosh*, 21 U.S. 543, 572, 5 L. Ed. 681, 688 (1823). It is perhaps noteworthy that Illinois and Minnesota, apparently Iowa's only two border states that have considered the issue, have adopted the free access rule. *See Beacham*, 526 N.E.2d at 157; *Johnson*, 100 N.W.2d at 696–97. Moreover, in light of the benefits of the free access rule, it is not too much for our law to require lake bed owners to permit the reasonable use of surface water by other lake bed owners. This approach best reflects our modern values of free use and enjoyment of lakes and streams in Iowa and still protects the rights and ownership of lake bed owners by only permitting others to use the surface water in a reasonable manner, and not terminating any rights a lake bed owner has in the land.

I do not know how many Iowans share the shores of nonnavigable lakes around the state so as to be affected by the holding in this case, but I suspect there are many. In each instance, the inflexible rule adopted by the majority could leave unwanted consequences. For example, it will permit lake bed owners to build fences into the lake to mark boundary lines. It will also give rise to claims of trespass for operating boats in waters over land owned by another or for merely "casting a fishing line into water" over land owned by another. Carroll, 80 Tul. L. Rev. at 908. We, of course, know of

the uncivilized conduct exhibited by the property owners in this case. This is not the Iowa our laws should create.

While the majority rule toasts the rugged and proud American spirit of individualism and self-determination commonly tied to land ownership, *see* Freyfogle, 25 Ecology L.Q. at 574 ("Among the peculiar traits of the United States is its pronounced preoccupation with individual rights and its tendency to discuss social problems in individual terms."), these notions are largely illusory when applied to lakes. The same self-control given to one landowner is also enjoyed by the other landowners around the lake. Without a shared, community approach and understanding, any single lake bed owner can disrupt or destroy the common aspirations of living on a lake for everyone else by exercising their individualism over the portion of the lake they control. When individual control over a portion of the lake is the desired goal, no person can share in the common attributes of life on the lake. The better rule is a community approach to littoral rights, which the free access rule accomplishes without diminishing our individual property rights. *See id.* at 588 ("From water law there is the sensible [free access] rule governing the surface use of nonnavigable lakes; in that case, too, individual property rights are mingled and shared, without diminishing their value."). When we deal with our world's resources, that is the best, if not the only, policy to follow.

The policy behind the free access rule best reflects life in Iowa in the twenty-first century. Rigid property rights of the past centuries should give way to the simple and fair solution of boundary disputes offered by the better reasoned free access rule. Our laws pertaining to land, air, and water must begin to reflect that we coexist on Earth as one.