# IN THE COURT OF APPEALS OF IOWA

No. 20-0336
Filed May 12, 2021

**MIDSTATES BANK, N.A.,**
    Plaintiff-Appellee,

**vs.**

**LBR ENTERPRISES, LLC,**
    Defendant-Appellee,

**and**

**EDWARD A. TOMAS and BARBARA E. TOMAS,**
    Defendants-Appellants.
_____

**EDWARD A. TOMAS and BARBARA E. TOMAS,**
    Cross-Claim Plaintiffs-Appellants,

**vs.**

**LBR ENTERPRISES, LLC,**
    Cross-Claim Defendant-Appellee.

Appeal from the Iowa District Court for Ringgold County, Bradley McCall, Judge.

A husband and wife appeal the grant of reformation of a warranty deed based on an alleged scrivener's error. **AFFIRMED.**

Brett T. Osborn, West Des Moines, for appellants.

Aimee K. Cizek and Travis J. Marr, Omaha, Nebraska, for appellee.

Heard by Bower, C.J., and Tabor and Ahlers, JJ.

**TABOR, Judge.**

This case involves a dispute over the reformation of a warranty deed that reserved to the sellers, Edward and Barbara Tomas,[1] a life estate in 234 acres of farmland. That deed was the product of a purchase agreement that specified the life estate was only in "the house which they currently reside." Midstates Bank financed the purchase from the Tomases and took a mortgage on the property to secure its loan. Upon discovery of the discrepancy between the purchase agreement and the deed, Midstates petitioned for reformation. The mortgagee bank alleged the deed contained a scrivener's error and did not reflect the true intent of the parties. Agreeing with that contention, the district court reformed the deed to reflect the life estate as described in the purchase agreement.

The Tomases now appeal, raising five issues: (1) the mortgagee lacked standing to seek reformation; (2) the mortgagee did not offer sufficient proof that the deed contained a scrivener's error; (3) the doctrine of merger should have precluded reformation; (4) the district court erred in allowing the buyer to testify on behalf of the mortgagee; and (5) the mortgagee was not entitled to rental income from the farm. Finding no merit in these contentions, we affirm.

## I. Facts and Prior Proceedings

The Tomases owned two tracts of Ringgold County farmland as joint tenants. The real estate consisted of a 202-acre farm and a thirty-two-acre homestead.[2] Their oldest son, Eddie, farmed the land for the first year. After that,

---

[1] We will refer to the couple as the Tomases.
[2] The Tomases designated the thirty-two-acre tract as their homestead in April 2019, six months before trial.

the Tomases leased their farmland for rental income. Eddie provided custom farming services in the area and operated a small trucking business.

Eddie met Steve Berendes in 2011 while working on a farm that Berendes's company had financed. That year, Berendes and three partners had formed LBR Enterprises, LLC, to contract with farmers around Ringgold County and finance their operations. After crossing paths on different farms, Eddie and Berendes developed a close working relationship. Later, after becoming LBR's sole owner, Berendes hired Eddie. With Eddie's help, Berendes converted LBR into a cattle-feeding business.

In early 2013, the Tomases were searching for a new farming tenant. Knowing his parents relied on rental income, Eddie asked Berendes if he would be interested in renting his parents' farmland to expand LBR's operations. Within a few months, the conversation evolved from renting the Tomases' farmland to buying it. When asked what prompted the change, Berendes explained:

> I really didn't have any interest in purchasing any ground over there per se, but in getting to know [Eddie] and stuff, he made me aware that his parents really needed to sell the ground, that they were having difficulty making the payments, that they were late on their taxes, and that the current renters on the property sure weren't doing the property any good.

So Eddie and Berendes discussed a deal. Eddie explained his parents were willing to sell their property but with a caveat—they wanted to continue living on the farm. Berendes responded, "All we have to do is give them a life estate in that farmhouse, and so long as they're able to live on their own out in the country, they can have it." The Tomases agreed to this arrangement.

Berendes and Eddie negotiated a purchase price of $655,200, notably less than the appraised value of $971,200. Barbara explained she was willing to accept the lower offer because her end goal was to help Eddie buy the farm when he acquired an ownership interest in LBR. She added: "And at that point, the life estate would not be—I don't know what the word is I want—would not be enforced, but we'd still be able to live there because Eddie's not going to kick us off."

According to Berendes, Barbara visited his office once that summer to go over their agreement. They had never met before to discuss the transaction because Eddie acted as an agent for his parents. Berendes recalled reassuring Barbara that she could stay in her home as a life estate holder. Berendes continued:

> And I also mentioned that there might be a possibility that maybe we should get [the life estate] measured off so that we knew exactly, you know, how much around the house, she had a garden there and stuff, was included in that so we didn't have any problem and that we get right of way to go and feed our livestock on the main lane.

During that same conversation, Berendes said he offered to conduct a survey of the anticipated life estate, but she declined. He estimated the life estate would span two acres. Barbara denied having that conversation.

In August 2013, Berendes drafted the purchase agreement. The first paragraph provided:

> Property consists of 234 acres more or less in two tracts. The offer is for 655,200.00. This is to be paid first to current mortgage holders to pay off that debt, then to satisfy all taxes currently owed and due, as well as any prorated taxes paid by seller of property to the date of transfer, and then an amount to cover current capital gains taxes due to this sale. Any remaining balance will be put on a promissory note which will be a second Mortgage equal to the amount owed after the heretofore debts have been satisfied.

The second paragraph addressed the life estate:

> LBR Enterprises agree to grant a life estate to Edward and Barbara Tomas in the house which they currently reside on the property until such time as they decide to move, at which time the house will then revert to the ownership of LBR Enterprises. Edward and Barbara Tomas will pay for the electric and water utilities to said residence until they move.

Berendes signed the agreement, and then Eddie delivered it to his parents. They each signed it the same day. The Tomases did not object to the agreement as written. But Barbara later said she had different terms in mind. When asked what she believed the life estate entailed, Barbara replied: "My understanding was it meant that we had the right to live on the thirty-two acres, get the income off of it and have it until we both had passed." Berendes insisted those terms were not in the purchase agreement because he and Eddie never discussed the thirty-two acres as part of the deal.

Later that fall, Eddie and Berendes met with David Klasna, an agricultural loan officer and senior vice president of Midstates Bank.[3] Berendes asked for a loan amount that could pay off the Tomases' mortgage on the property, as well as delinquent property taxes. Berendes and Eddie also described the details of the purchase agreement. Based on their conversation, Klasna approved a loan for $655,000. In an October 2013 credit approval memorandum, Klasna summarized the transaction:

> Steve Berendes has offered to purchase the land for LBR from the [Tomases] at a price of $655,200. The land appraised for $971,200. LBR will pay the $565,600 plus all transfer costs immediately, which will retire all the debt on the property currently owed by the [Tomases]. The remaining $89,600 will be applied to the LBR operating loan and paid to [the Tomases] over time to

---

[3] Berendes had financed some of LBR's prior operations through Midstates.

spread out the capital gains. [The Tomases] may file a mortgage for that amount to secure the future payments (junior to mortgage of MSBNA). In addition, LBR will grant a life estate in the home that is on this property to the [Tomases] so they have a place to live for as long as they want.

Klasna recalled both Berendes and Eddie made it clear that the life estate "only included the house."

After Midstates approved the loan, it engaged the services of a title company to prepare the warranty deed. Michelle Fowler, then-employee of the title company, received the order. Ordinarily, she would review the purchase agreement and enter the names of the parties, the lender, and a legal description of the property into the company's computer database. But a belated title search pressured Fowler to enter that information in "a complete rush." While frantic, she neglected to review the purchase agreement before drafting the deed. As a result, the deed did not match the life estate description in the purchase agreement. Fowler attested to her mistake at trial, acknowledging her oversight created inconsistencies between those two documents. Attorney Aimee Cizek asked Fowler at trial: "And so in your estimation should a warranty deed's language always match the language of the purchase agreement?" Fowler replied, "Yes."

The warranty deed prepared by Fowler stated:

For the consideration of One and 00/100 Dollar(s) and other valuable consideration, Edward A. Tomas and Barbara E. Tomas, husband and wife as joint tenants . . . do hereby Convey to LBR Enterprises, LLC, with a life estate interest in Edward A. Tomas and Barbara E. Tomas . . . whether one or more the following described real estate in Ringgold County, Iowa[.]

Missing was the qualifying language "in the house which they currently reside on the property." Fowler testified that if she had reviewed the purchase agreement

like usual, the deed would have included that language. Neither Midstates, nor the Tomases, nor Berendes discovered the variance.

In December 2013, the parties executed the warranty deed. The Tomases and Berendes separately reviewed the closing documents. Two weeks later, Midstates secured its loan to LBR by obtaining a mortgage on the 234-acre farm. The Tomases were not a party to the mortgage instrument. Klasna testified that the Tomases' interest was a nonissue "[b]ecause [Midstates] understood that all they had was a life estate in the house, and [it] could live with that."

After the closing, Midstates settled the Tomases' outstanding debt on the property and issued a check for the difference of $134,000. The check was issued to both the Tomases and LBR. According to Klasna, Eddie and Berendes agreed from the onset that "[LBR] could use those funds to improve the property, and it would be like equity for Eddie" when he acquired the farm. Barbara expressed a different view. She said under the purchase agreement, the proceeds were supposed to be held in an escrow account for Eddie. She explained: "And [Berendes] said we could get all of it or any part of it at any time we needed, and he would pay us [five] percent on the remainder principal; like if we used some of it, he would pay on the remainder." But according to Barbara, they modified that provision of the purchase agreement before the December closing. She claimed Berendes orally agreed to expand their life estate from 32 acres to all 234 acres, in exchange for LBR's use of the proceeds. She added: "But we would still be able to get that money at any time, he said, plus he'd still pay the 5 percent interest."

By contrast, Berendes said he promised Barbara a second mortgage on the property as security for borrowing the proceeds. He insisted he never agreed to

modify the life estate under the purchase agreement. Nor did he mention an escrow account. Neither Barbara's nor Berendes's version was reduced to writing.

For the next two years, LBR farmed the land and made improvements to the real estate. No issues arose until 2016 when LBR defaulted on its loan payments to Midstates. After liquidating LBR's assets, Berendes procured a willing buyer to transfer title. But the title company blocked the sale, noting the deed named the Tomases as the life estate holders of the entire property.

In May 2017, Midstates petitioned for reformation against LBR and the Tomases. Midstates claimed the deed did not reflect the true intent of the parties because of mutual mistake and a scrivener's error. In their answer, the Tomases raised the affirmative defense that Midstates lacked standing to seek reformation. The Tomases also filed a cross-claim against LBR and Berendes, in his individual capacity, alleging they breached the purchase agreement and owed them $134,000. But the court automatically stayed the proceedings against Berendes after he filed a notice of bankruptcy.

Following a contentious trial, the district court granted Midstates's request. The court reformed the deed executed by the Tomases in December 2013 to reflect that their life estate was only "in the house in which they currently reside." The Tomases moved to reconsider, but the court denied their motion. The Tomases appeal.

## II. Scope and Standard of Review

Because reformation of a deed is an equitable remedy, we review the district court's ruling de novo. Iowa R. App. P. 6.907; *see Orr v. Mortvedt*, 735 N.W.2d 610, 613 (Iowa 2007). We give weight to the court's fact findings,

especially when considering the credibility of witnesses, but they do not bind us. Iowa R. App. P. 6.904(3)(g).

### III. Analysis

### A. Standing

Reprising their argument from the district court, the Tomases urge Midstates lacked standing to seek reformation. They rely on the two-prong test for standing, requiring the plaintiff to show (1) a specific personal or legal interest in the litigation and (2) injury in fact. *See Godfrey v. State*, 752 N.W.2d 413, 418 (Iowa 2008). On the first prong, the Tomases argue the bank was not a party to the deed and was never in "privity of contract" with them. On the second prong, they argue any injury to Midstates resulted from the bank's own negligence.

To counter, Midstates insists that because it has a mortgage on the real estate, it has standing to bring this action. It cites *Hosteng Concrete & Gravel, Inc. v. Tullar* for the proposition that a reformation action is not limited to the original parties to an instrument, but may also be brought "by a real party in interest claiming privity with a party to the instrument, such as a purchaser at an execution, judicial or foreclosure sale."[4] 524 N.W.2d 445, 449 (Iowa Ct. App. 1994). As the mortgagee, Midstates claims it has privity with LBR, a party to the deed. On the second prong, Midstates asserts "that the difference in the value of the Real Estate

---

[4] In their reply brief, the Tomases rely on *Hosteng* in claiming that a real party in interest claiming privity with a party to the instrument only includes "purchasers, not lenders or anyone with a secondary interest in property." But *Hosteng* singled out purchasers because that was the nonparty seeking reformation in that case. Contrary to the Tomases' assertion, the supreme court cited a list of secondary sources that include a broader list of possible privies. *See, e.g.*, 66 Am. Jur. 2d *Reformation of Instruments* §§ 59–63 (2d ed. West 2021 update).

(with the encumbrance of the life estate being on the entire 234 acres versus it being only in the house) is substantial, thus making [its] security interest in the farm 'injuriously affected' by the Deed without reformation."

We start with the first element. In effect, both parties recognize that privity with a party to the deed qualifies as a "legal interest" that would allow that real party in interest to seek reformation. Privity means "a mutual or successive relationship to the same rights of property." *In re Estate of Richardson*, 93 N.W.2d 777, 781 (1958). Relying on *Hosteng*, Midstates claims it was a real party in interest because LBR "conveyed and mortgaged" the entire property to the bank as collateral for the bank's loan.[5] The Tomases counter that Midstates's security interest did not place it in privity with the parties to the deed. In their view, "[t]he relationship from purchaser to purchaser is successive, but the one from purchaser to lender is not."

On privity, the Tomases have the more persuasive argument. Under our case law, "a mortgagee has no estate in the land but simply a specific lien or charge thereon to secure his debt." *Miles Homes, Inc. v. Grant*, 134 N.W.2d 569, 699 (Iowa 1965) (citing *Johnson v. Bd. of Supervisors*, 24 N.W.2d 449 (Iowa 1946)); *see Burns*, 11 N.W.2d at 465 (noting a mortgage "is merely a lien" that does not reduce the mortgagor's interest in the land). Because Midstates was no more than a lienholder, it did not possess the same rights to the property as LBR, the legal title holder by transfer of the deed. *See* Iowa Code § 557.14 (2017) ("In

---

[5] In common law, "a mortgage was considered a conveyance of the land or a pro tanto disposition of the property by the mortgagor." *Burns v. Burns*, 11 N.W.2d 461, 465 (Iowa 1943). But Iowa has abrogated the common law rule. *Id.*

absence of stipulations to the contrary, the mortgagor of real estate retains the legal title and right of possession thereto.").

Yet the absence of privity does not end our analysis.[6] As discussed, being in privity with a party to the deed is one way to establish a legal interest under the first prong of the standing test. But it is not the only way. To meet that first prong, Midstates must "allege some type of injury different from the population in general." *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 289 (Iowa 2017) (quoting *Hawkeye Foodserv. Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 606 (Iowa 2012)). No doubt Midstates had a specific legal interest in seeking reformation—to settle the unpaid debt owed by LBR. Because the deed made it appear that the Tomases had a life estate in the entire 234 acres, Midstates could not take immediate possession of the property. And if Midstates brought a foreclosure action due to LBR's default, any party obtaining the land through that process would take title subject to the Tomases' claimed life estate. Plus, if LBR tried to sell the land to avoid foreclosure, LBR could not transfer title to a subsequent purchaser unless the purchaser agreed to take the property subject to the claimed life estate. Because Midstates paid off the existing mortgage and

---

[6] A Texas appellate court undertook a similar tack. In *Kidwell v. Black*, 104 S.W.3d 686 (Tex. Ct. App. 2003), the court found that a mortgagee had standing to reform several deeds despite not being a party to any of them. The most recent purchaser of the real estate, Kidwell, argued the mortgagee, Black, lacked standing because of the lack of privity between them. *Kidwell*, 104 S.W.3d at 690. The court, without deciding the privity issue, applied the state's general standing test requiring (1) a real controversy between the parties, and (2) the resolution of that controversy depend on the judgment sought. *Id.* The court held Black had standing because the lender had an interest in the deed of trust, which depended on the validity of a prior purchaser's interest and conflicted with Kidwell's interest as the most recent purchaser.

attached its security interest to the real estate, it had first priority upon default. Thus, its inability to pursue appropriate remedies provided by law is specific to Midstates and different from the population in general.[7] We find the first element of standing satisfied.

We turn to the second element, injury in fact, which has "much in common" with the first element. *Godfrey*, 752 N.W.2d at 419 (acknowledging these elements are often considered together). To prove injury in fact, Midstates must show harm that is "concrete" and "actual or imminent" rather than "conjectural" or "hypothetical." *See Hawkeye Foodserv.*, 812 N.W.2d at 606. But it is not conjecture or hypothesis that bothers the Tomases. Instead, they allege that any injury to the bank was its own doing. The Tomases point to Midstates's failure to have them, as life tenants, sign the mortgage. They argue Midstates is bringing this reformation action only to "subvert" its mistake and "not because there was any true error with the Warranty Deed." This contention puts the cart before the horse.

By contesting the bank's standing to seek reformation, the Tomases want us to reverse without reaching the merits. *See Hefel*, 893 N.W.2d at 289 ("The question of standing is separate from the merits of the case, and we address it first."). Yet their argument presupposes they win on their substantive claims. Put

---

[7] The mortgage instrument listed possible remedies upon default. For example: "Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Mortgage in a manner provided by law if this Mortgagor is in default. Upon a default by the Mortgagor, the Lender may take possession of the Property itself or through a court appointed receiver . . . and may operate the Property and collect the rents and apply them to the costs of operating the Property and/or to the unpaid debt."

another way, to find Midstates was negligent, we would have to accept (1) that the Tomases did in fact retain a life estate in the entire property, and (2) the bank knew about that modification when executing the mortgage. We decline to accept those facts as part of the standing analysis. The extent of the life estate is the crux of this appeal. And its resolution must await our consideration of the merits.

What we can find now is that Midstates met the injury-in-fact requirement. The district court reasoned: "While there was no specific testimony as to the difference in value of a parcel to which individuals in their 70s have a life estate and the same parcel without such an encumbrance, there is little question the difference is substantial." Based on that reasoning, the court held "[Midstates's] security interest in the farm [was] 'injuriously affected' by reason of a life estate on the entire 234-acre parcel." We agree. And we amplify the district court's reasoning under Iowa Code chapter 450. That chapter prescribes the method for calculating the value of life estates and remainder interests for inheritance tax purposes. Section 450.51 provides that a life estate should be valued "by the use of current, commonly used tables of mortality and actuarial principles pursuant to regulations prescribed by the director of revenue."[8] Those tables reflect "the present worth of remainder interests subject to a life estate of a person" based on the life tenant's age. *In re Millard's Estate*, 105 N.W.2d 95, 98 (Iowa 1960).

So our calculus considers that Barbara was seventy-two years old at the time of trial. The appraised value of the real estate was $971,200. Thus, according to the standard mortality tables for life estates and remainders, the value of her life

---

[8] We rely on this statute to the extent that it relates to the general valuation of real property interests.

estate was $364,520, leaving a remainder interest of $606,680. *See* Iowa Admin. Code r. 701-86.7(6) (2021) (using 2001 tables). Because Midstates's security interest equaled the appraised value under the mortgage instrument, its interest was diminished by nearly 38 percent. That diminution supports Midstates's position that it had an actual or imminent injury sufficient to support standing. For these reasons, we conclude Midstates had standing.

## B. Reformation of the Warranty Deed

### 1. Scrivener's Error

Moving to the merits, the Tomases argue the district court should have denied Midstates's request for reformation, alleging the bank did not meet its burden of proving (1) a scrivener's error created a mistake in the deed,[9] (2) the deed did not reflect the true intent of the parties, and (3) the purchase agreement did not merge into the subsequent deed.

Conversely, Midstates contends it offered sufficient proof of mistake through the testimony of "the unbiased scrivener who actually made the error." Relying on the testimony of Fowler, the title company employee, Midstates claims the deed would have matched the language in the purchase agreement but for her admitted error. Midstates maintains the parties' agreement did not change after they signed the purchase contract. Thus, Midstates argues the deed did not reflect

---

[9] "A scrivener is (or, better, was) a transcriber of documents. In the literal sense, then, a 'scrivener's error' is a mistake of transcription, which is to say a mismatch between original (e.g., spoken word, manuscript) and copy." *Goche v. WMG, L.C.*, No. 18-0793, 2019 WL 1057105, at *2 n.5 (Iowa Ct. App. Mar. 6, 2019) (quoting Ryan D. Doerfler, *The Scrivener's Error*, 110 Nw. U. L. Rev. 811, 816 (2016)). A scrivener's error is a proper basis for reformation if, as a result of the error, "the written agreement does not accurately reflect the intent of the parties." *Id.* (quoting 66 Am. Jur. 2d *Reformation of Instruments* § 19).

the true intent of the parties, and the doctrine of merger did not apply. We will address each contention in turn.

Reformation is an equitable remedy available to a challenger who can prove an instrument does not reflect the parties' true agreement. *Timmer v. New York Life Ins. Co.*, 270 N.W.2d 421, 422 (Iowa 1936). The party seeking reformation must establish that contention by clear, satisfactory, and convincing proof. *Kufer v. Carson*, 230 N.W.2d 500, 503 (Iowa 1975). Reformation of a deed may be appropriate if the party seeking relief shows "the deed does not reflect the true intent of the parties, either because of fraud or duress, mutual mistake of fact, mistake of law, or mistake of one party and fraud or inequitable conduct on the part of the other." *Kendall v. Lowther*, 356 N.W.2d 181, 187 (Iowa 1984). But "[t]he requirement of mutuality of mistake does not apply to a mistake of a scrivener in reducing an agreement to writing." *Gouge v. McNamara*, 586 N.W.2d 710, 713 (Iowa Ct. App. 1998) (citing *Schuknecht v. W. Mut. Ins. Co.*, 203 N.W.2d 605, 609 (Iowa 1973)). Also, the party seeking reformation must show that the true intent of the parties would be reflected in a reformed document. *Kendall*, 356 N.W.2d at 187. The right to reform an instrument is not absolute; rather, it lies within the discretion of the equity court and must be essential to achieving justice. *Kufer*, 230 N.W.2d at 504 (holding party seeking reformation of deed did not show clear and convincing evidence, in part, because he did not present any disinterested witness's testimony).

Unlike the party seeking reformation in *Kufer*, Midstates *did* offer proof that the deed contained an error through the testimony of Fowler, a disinterested

witness. The Tomases contest whether Fowler was a neutral party.[10] But we find that she was. Fowler worked for a third-party title company, which was not affiliated with LBR or Midstates. Her job was to type information into an automated system that created the deed by template. Fowler testified that she made a mistake in not including the language from the purchase agreement that limited the life estate. As a result of her oversight, the deed did not match the purchase agreement.

The Tomases tell a different story. They contend the purchase agreement was purposely modified to grant them a life estate in the entire property. According to the Tomases, LBR's alleged failure to satisfy the terms of the purchase agreement was proof that their original agreement changed. But they shed no light on how that modified agreement slid into the warranty deed. If Berendes agreed to significantly expand the life estate before the closing, we see no reason why the Tomases did not seek to amend the purchase agreement and protect their interests. After the alleged modification, neither the Tomases nor Berendes notified the bank or the title company. Nor did they reduce the new agreement to writing or exchange consideration. Although the Tomases claim the sale proceeds constituted consideration, other witness accounts and the bank's credit approval memorandum show that LBR's use of the proceeds were part of the original

---

[10] As a side issue, the Tomases also argue that Fowler, by creating the warranty deed, engaged in the unauthorized practice of law. The Tomases did not argue this issue before the district court, though their counsel alluded to it when asking questions during Fowler's cross-examination. But merely raising the issue is insufficient to preserve error. *See Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002). Because the district court did not decide whether Fowler engaged in the unauthorized practice of law, we decline to address the issue on appeal. *See id.*

agreement. Thus, the only evidence to suggest this modification occurred was Barbara's own self-serving testimony.

Moreover, Berendes and loan officer Klasna testified that the agreement to purchase the property from the Tomases depended on the life estate being limited to the house. In other words, LBR would not have agreed to purchase the farm and Midstates would not have financed its purchase. According to their testimonies, that would have been true even if the Tomases had asked to retain a life estate in the 32-acre homestead, let alone the entire 234 acres. On our de novo review of the record, we find clear and convincing proof that the deed did not reflect the agreement of the parties because of a scrivener's error.

### 2. Intent of the Parties

We must also decide whether Midstates proved that a reformed deed would reflect the parties' true intentions. As the district court noted, the Tomases did not act as though they had a life estate in all 234 acres. After the conveyance, the Tomases received no rents or profits; they did not contribute to the farm's upkeep; and they did not pay property taxes or insurance. Moreover, when Klasna visited the Tomases to discuss the discrepancy in the deed years later, they still did not mention having a life estate in the entire property. According to Klasna, their only concern upon LBR's default was recovering the proceeds.

Beyond the Tomases' conduct, the purchase agreement revealed the parties' intent. When determining whether to grant reformation, a key factor is whether there is a prior agreement between the parties "furnishing the basis for rectification or to which the instrument can be conformed." *Sun Valley Lake Ass'n v. Anderson*, 551 N.W.2d 621, 636 (Iowa 1996) (citing 66 Am. Jur. 2d *Reformation*

*of Instruments* § 4, at 529 (1973)). The purchase agreement clearly stated that the Tomases would retain a life estate in the house in which they currently reside. We find clear and convincing evidence that the deed left out that limitation because of a scrivener's error—not because the parties changed their agreement. Thus, reforming the deed to include the language from the purchase agreement would reflect the parties' true intentions.

### 3. Merger Doctrine

Even if Midstates met its burden of proving a scrivener's error and intent, the Tomases argue a presumption that the purchase agreement merged into the deed precluded reformation. They claim Midstates could not rely on the purchase agreement "as the only evidence that the Warranty Deed did not reflect the intentions of the part[ies]." In the same vein, the Tomases challenge the evidentiary value of the purchase agreement, asserting "the terms of the purchase agreement had clearly altered for both parties."[11]

As a rule, "a contract for conveyance of real estate, absent any showing to the contrary, is deemed to have merged in a subsequent deed." *Lovlie v. Plumb*, 250 N.W.2d 56, 62 (1977). In other words, if a conflict exists between the two, "the deed speaks and the contract is silent." *Huxford v. Trustees*, 185 N.W. 72, 74

---

[11] To support their contention, the Tomases refer to this paragraph of the purchase agreement: "Any remaining balance will be put on a promissory note which will be a second Mortgage equal to the amount owed after the heretofore debts have been satisfied." In the district court, the Tomases argued the purchase agreement no longer reflected the parties' agreement because Berendes never executed a promissory note for a second mortgage. The court disagreed. The court found that although no promissory note existed, "retention of the excess proceeds after payment of expenses was contemplated at the time the agreement was signed." We agree with the district court on this point.

(Iowa 1921). But there are exceptions to this rule. *See id.* One recognized exception is mistake. "If a mistake in the deed be alleged and reformation be sought, the contract becomes competent as evidence on that question." *Id.* Because Midstates sought to reform the deed based on a scrivener's error, the district court could consider the purchase agreement as competent evidence whether a mistake occurred.

The Tomases do not dispute the purchase agreement was competent evidence. Instead, they urge the district court gave it too much weight in concluding the deed did not reflect the true intent of the parties. We disagree. Because the merger doctrine assumes the deed was the final expression of the parties' agreement, the question boils down to whether the parties agreed to modify the life estate from "the house which they currently reside" to the entire property. Because neither party presented proof of any written modification, the district court's conclusion hinged on witness accounts and credibility determinations.

The district court expressly found Barbara and Eddie were not credible. In refusing to enlarge the ruling on the scope of the life estate, the court explained:

> In fact, the Court specifically found clear and convincing evidence supports the conclusion the parties intended for Mr. and Mrs. Tomas to retain a life-estate only "in the house." In reaching this conclusion the Court specifically rejected the testimony by Barbara and Eddie Tomas to the effect that the intention of the parties was for Mr. and Mrs. Tomas to retain a life-estate in either the 32 acre parcel or the entire 234 acre farm.

We defer to these credibility findings. *See Weinhold v. Wolff*, 555 N.W.2d 454, 458 (Iowa 1996). Plus, Klasna corroborated Berendes's version of events. Klasna

testified that Eddie and Berendes confirmed the life estate was to be only in the house at a meeting two months after the parties signed the purchase agreement.

On top of that, the district court found that the Tomases' actions after the transfer were inconsistent with holders of a life estate in the farmland, similar to the facts in *Koehn v. Koehn Bros. Farms, LLC*, No. 13-1036, 2014 WL 4230200, at *12 (Iowa Ct. App. Aug. 27, 2014) (rejecting claim that life estate spanned entire property when holders went three years without collecting rent, paying taxes, or funding improvements). Discounting the testimony of Barbara and Eddie, based on the district court's credibility findings, no other evidence suggests the deed as written was accurate. Like the district court, we find the parties did not intent for the purchase agreement to merge into the deed.

## C. Admission of Opposing Party's Witness

The Tomases next attack the admission of Berendes's testimony.[12] They argue it was "self-serving and inconsistent with the facts of the case." But the Tomases fail to cite legal authority to support their allegations. Likewise, they do not elaborate on their assertion that Berendes's testimony was inadmissible.[13] We conclude they waived these issues. *See* Iowa R. App. P. 6.903(2)(g)(3).

---

[12] The Tomases also challenge the court's refusal to rule on their quiet title action against LBR. Because the reformation action defeats their claim to title, we need not address that contention.

[13] The record shows the Tomases filed a motion for sanctions against LBR for violating a discovery order. As a sanction, the Tomases asked the court to prevent Berendes from testifying at trial. Midstates resisted the motion because it intended to call Berendes as a witness. The court denied the motion, finding it could not sanction Midstates for LBR's lack of compliance. Thus, Berendes testified as a witness for Midstates, not on LBR's behalf. The Tomases do not challenge this ruling on appeal.

### D. Rental Income

Finally, the Tomases assert the district court wrongly denied them access to rental income collected during the proceedings. They received an $18,750 rent check from a tenant after entering into a new lease agreement in April 2019. Midstates asked the court to terminate the farm lease and to deposit the funds until the final ruling. The Tomases stipulated to termination of the lease but resisted the deposit request, claiming the funds were being held in their attorney's trust account. They also added that they were "entitled to the income and profits of the land" as the life tenants of the property. The court allowed the funds to remain in counsel's trust account.

After the final decree, the Tomases moved for an immediate release of the $18,750 in their favor. They urged they needed the money to pay off delinquent property taxes. In resistance, Midstates informed the court that it had paid all delinquent taxes in January 2020, so the issue was moot. The court denied the Tomases' request. In awarding Midstates the rental income, the court reasoned: "In light of this Court's conclusion that [the Tomases] retained a life-estate only 'in the house', it is clear [they] are not entitled to receive rental income for farm land in which they have no interest." We agree with the court's conclusion based on our affirmance of the other issues.

**AFFIRMED.**